#26299-a-PER CURIAM

**2012 S.D. 88**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE PEOPLE OF THE STATE OF SOUTH DAKOTA IN THE INTEREST OF
S.H.E., D.H.E., J.W.C., D.W.C., J.R., and M.W.C., CHILDREN, and
CONCERNING N.W.C., S.W.C., J.T., and M.H.E., RESPONDENTS,
OGLALA SIOUX TRIBE, INTERVENER.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE WALLY EKLUND
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

ANN M. HOLZHAUSER
Special Assistant Attorney General
Pierre, South Dakota                          Attorneys for appellee
                                              State of South Dakota.

JEAN CLINE of
Feehan & Cline, PC
Rapid City, South Dakota                      Attorneys for appellant
                                              Father, S.W.C.

\* \* \* \*

CONSIDERED ON BRIEFS
NOVEMBER 15, 2012

OPINION FILED **12/12/12**

PER CURIAM

[¶1.]    A father appeals the termination of his parental rights to his four children.  Because the children are enrolled members of the Oglala Sioux Tribe, the Indian Child Welfare Act applies.  We affirm.

## Background

[¶2.]    S.W.C. (Father) is the biological father of J.W.C. (Son1), D.W.C. (Son2), J.R. (Son3), and M.W.C. (Daughter1) and the stepfather of S.H.E. (Stepdaughter1) and D.H.E. (Stepdaughter2).  N.W.C. (Mother1) is Father's wife and the biological mother of Son3, Daughter1, Stepdaughter1, and Stepdaughter2.[1]  J.T. (Mother2), who was never married to Father, is the biological mother of Son1 and Son2.  The children resided with Father and Mother1.  At the initiation of this proceeding, Stepdaughter1 was 14, Stepdaughter2 was 12, Son1 was 8, Son2 was 7, Son3 was 5, and Daughter1 was 3.

[¶3.]    On August 7, 2010, law enforcement authorities notified DSS that Stepdaughter2 revealed that Father had raped her.[2]  The children were placed with a family friend under an Immediate Protective Plan.  On August 10, the family

---

1.    The biological father of Stepdaughter1 and Stepdaughter2, M.H.E., requested to have his parental rights terminated at the dispositional hearing.

2.    Father denied the allegations, but a rape kit completed on Stepdaughter2 confirmed that a rape had occurred.  At the time of the dispositional hearing, an investigation was in progress and Stepdaughter2 was scheduled to testify before a grand jury, but no charges had been filed.

friend informed DSS that she was no longer able to care for the children and the children were taken into DSS custody and placed in foster care.[3]

[¶4.]        In September 2010, DSS met with Father and Mother1 on three separate occasions to develop a case plan. The parties reviewed safety threats identified by DSS, namely Father's presence in the home and the couple's drug and alcohol abuse. The couple disagreed with the safety threats, denied any wrongdoing, did not complete a urinalysis as instructed by DSS, and admitted they recently smoked marijuana.[4] In addition, Mother1 declared that she was unsure if she believed Stepdaughter2's allegations against Father.

[¶5.]        The Oglala Sioux Tribe intervened on October 4, 2010. On October 7, DSS filed a petition alleging that the children were abused or neglected. Later, DSS amended the petition to include an allegation that Father was incarcerated.[5] An adjudicatory hearing was not held until March 21, 2011, at which time Father admitted the children lacked proper parental care because he was incarcerated and the children were adjudicated neglected.

[¶6.]        In the meantime, Mother1 entered into a case plan with DSS. Under this plan, Mother1 was to abstain from illegal drugs, complete drug and alcohol evaluations, and follow corresponding recommendations. She was also to attend

---

3.    Later, Stepdaughter1 and Stepdaughter2 were placed in treatment facilities for substance abuse and behavioral issues.

4.    As a result, DSS gave Father a telephone number for a treatment counselor, but he did not attempt to visit a treatment counselor.

5.    Father returned to prison on October 28, 2010 for violating his parole due to marijuana use, the same reason he was found to have violated his parole four other times.

therapy, take medication, and keep the children away from inappropriate or harmful individuals. To help Mother1 reach the objectives of her case plan, DSS offered her food vouchers, gas assistance, bus passes, professional referrals, and transportation to family visits, including visits at the Abbott House in Mitchell where Stepdaughter1 and Stepdaughter2 resided.

[¶7.] After entering the case plan with DSS, Mother1 continued to live with Father.[6] She resisted completing urinalysis tests and frequently turned down offers for transportation to the tests. Although she saw a therapist twice in October 2010, she did not attend therapy or take medication after those visits, reasoning that therapy and medication were unnecessary as she was attending sweat lodges weekly. Further, Mother1 did not complete a chemical dependency evaluation until approximately ten months after the case was initiated, did not attend treatment, and continued abusing alcohol, marijuana, and other substances. In fact, in October 2010, she was hospitalized for several days due to a drug overdose. Additionally, Mother1 rarely had a job and did not have her own house or car.

[¶8.] On the other hand, Mother1 consistently attended family therapy with Stepdaughter1 and Stepdaughter2 and weekly visits with the children. During those visits, she bonded with the children and behaved appropriately. To DSS specialists, it was evident that she loved the children. Mother1 also wrote the children several letters using postage-paid envelopes provided by DSS.

---

6. Later, Mother1 claimed that she ended the relationship, but intended to remain married to Father.

[¶9.]     Nevertheless, Mother1 was arrested for felony possession of methamphetamine, possession of drug paraphernalia, and ingestion of marijuana on April 20, 2011. She was released on $15,000 bond. Shortly thereafter, she tested positive for marijuana and was arrested for a bond violation. Mother1 pleaded guilty to the charges and was sentenced to four years in prison on September 26, 2011, with no possibility of release until January 2013.[7]

[¶10.]     Mother2 also entered into a case plan with DSS. Under this plan, Mother2 was to write letters to Son1 and Son2 and have consistent contact with them so that a healthy relationship could be developed. Mother2 was also required to abstain from drugs or alcohol. Initially, Mother2 made significant progress toward the objectives of her case plan. She consistently wrote to Son1 and Son2 and was interested in completing a home study. However, after the first evaluation, Mother2 was arrested for an alcohol-related incident, did not attend therapy or follow through on two home studies, and failed to keep in regular contact with DSS, as well as, Son1 and Son2.[8]

[¶11.]     Father met with DSS in September 2010 to develop a case plan. He was to remain sober; refrain from inappropriate sexual contact; attend counseling, follow corresponding recommendations, and take medication; attend drug and alcohol classes; and complete a parenting packet. However, before Father signed his case plan with DSS in December 2010, two significant events occurred. First,

---

7.     Shortly before sentencing, Mother1 was admitted to the emergency room complaining of gallbladder problems. At that time, she admitted she ingested methamphetamine the previous day.

8.     The last time Mother2 contacted Son1 and Son2 was in July 2011 by letter.

Father was incarcerated due to a parole violation for use and possession of marijuana. Second, Father attempted suicide in the Pennington County jail.

[¶12.] While he was incarcerated, Father attended two different therapy classes, took antidepressants daily, and was on a waiting list for drug and alcohol treatment. Father also wrote DSS five letters, requesting pictures and updates of the children and teleconferencing so he could talk to the children. In response, DSS sent Father court reports, three letters, and some pictures. DSS also sent Father a parenting packet and postage-paid envelopes. As a result, Father sent thirty-four letters to the children. Finally, DSS facilitated a visit between Father and the children while Father was in the Pennington County jail, completed two case plan evaluations, and included Father in concurrent planning meetings.

[¶13.] However, DSS never contacted Father to determine if he received the parenting packet or assessed his progress with regard to the packet. Although DSS asked if teleconferences could be set up, it failed to follow up on its first inquiry and did not attempt to determine why it never received a response. Further, despite monthly trips to Mitchell, no one from DSS visited Father at the penitentiary in Sioux Falls. The DSS family services specialist admitted, "I didn't. I just didn't go." Moreover, at the dispositional hearing, the specialist acknowledged that failing to establish teleconferencing and visits with Father was not active efforts. In regard to his efforts, he remarked, "There wasn't much [sic] other things that I could have offered to [Father] because of his incarceration."

[¶14.] A dispositional hearing was held on November 14, 2011. At that time, Father and Mother1 were both incarcerated and had made minimal progress

toward completion of their case plan. Father would not be released until August 2012 and Mother1 would not be released until January 2013, at the earliest.

[¶15.]     Stepdaughter1 and Stepdaughter2 were in a residential treatment facility for substance abuse and behavioral issues. Son1, Son2, and Son3 were in foster homes. Although the boys had various emotional and mental issues and expressed anxiety over their future and where they would be located, they were receiving therapy, were healthy, and were doing well in school. Finally, Daughter1, who exhibited extreme behaviors and was diagnosed with attention deficit hyperactivity disorder, was in a therapeutic foster home where she was doing well.

[¶16.]     At the dispositional hearing, the family services specialist and the ICWA expert testified that termination of parental rights would be the least restrictive alternative commensurate with the best interests of the children.[9] The circuit court agreed, finding that, based on the circumstances, including incarceration and absence of the parents, the State had made "reasonable and active efforts to provide remedial services and rehabilitative programs[,]" but that "these efforts [were] unsuccessful and . . . the conditions that existed at the time the children were removed still exist." Further, the court found that "there is little likelihood that the conditions will be remedied" and that serious emotional and/or physical damage would result if the children were returned to their parents.

---

9.     Both witnesses testified that Mother1's parental rights of Stepdaughter1 and Stepdaughter2 should not be terminated. They recommended that the circuit court order a planned permanent living arrangement for Stepdaughter1 and Stepdaughter2 based upon their age, their desire not to be adopted, and their close relationship with Mother1.

[¶17.] The court terminated parental rights to Son1, Son2, Son3, and Daughter1 with respect to all parents. As to Stepdaughter1 and Stepdaughter2, M.H.E.'s parental rights were terminated, but Mother1's were not, and the two girls were placed in a planned permanent living arrangement. The final order terminating parental rights was filed on January 25, 2012. Father appeals, arguing that DSS did not make active efforts to reunite the Indian family and that termination of his parental rights was not the least restrictive alternative commensurate with the best interests of the children.

## Standard of Review

[¶18.] In a case involving the termination of parental rights, we review the circuit court's findings of fact for clear error. *In re L.S.*, 2012 S.D. 22, ¶ 12, 812 N.W.2d 505, 508 (citing *People ex rel. J.I.H.*, 2009 S.D. 52, ¶ 19, 768 N.W.2d 168, 173). The circuit court's factual findings are clearly erroneous if "'we are left with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *People ex rel. P.K.*, 2006 S.D. 17, ¶ 17, 711 N.W.2d 248, 254). "Best interest of the child" and "least restrictive alternative" determinations are findings of fact reviewed under the clearly erroneous standard. *People ex rel. P.S.E.*, 2012 S.D. 49, ¶ 33, 816 N.W.2d 110, 119 (citing *People ex rel. L.S.*, 2006 S.D. 76, ¶ 36, 721 N.W.2d 83, 94). Finally, "[w]hether active efforts were provided under ICWA is a mixed question of law and fact subject to de novo review." *Id.* ¶ 15 (citing *People ex rel. J.S.B., Jr.*, 2005 S.D. 3, ¶ 24, 691 N.W.2d 611, 620).

## Analysis and Decision

### 1. Active Efforts

[¶19.]    Before parental rights may be terminated under ICWA, 25 U.S.C. §

1912(d) requires:

> Any party seeking to effect a foster care placement of, or
> termination of parental rights to, an Indian child under State
> law shall satisfy the court that active efforts have been made to
> provide remedial services and rehabilitative programs designed
> to prevent the breakup of the Indian family and that these
> efforts have proven unsuccessful.

"[T]he standard of proving active efforts is . . . beyond a reasonable doubt." *J.I.H.*,

2009 S.D. 52, ¶ 17, 768 N.W.2d at 172 (citing *In re E.M.*, 466 N.W.2d 168, 172 (S.D.

1991)).  It is undisputed that ICWA applies to these proceedings.

[¶20.]    Father argues the circuit court erred in finding, beyond a reasonable

doubt, that DSS made active efforts to reunify the family.  He contends that DSS

did not engage in any meaningful attempt to provide him with services once he was

incarcerated and that the minimal efforts it did make were not suitable or

conducive to providing any prospect of success.  The State suggests that "active

efforts" under ICWA and "reasonable efforts" under state law are

interchangeable,[10] and that sufficient efforts were made.

[¶21.]    We recently addressed the issue of whether "active efforts" and

"reasonable efforts" are synonymous in *People ex rel. P.S.E.*, 2012 S.D. 49, 816

N.W.2d 110.  Declining to follow the decisions cited by the State, we concluded that

---

10.    The State cites a California appellate court decision, *In re Michael G.*, 74 Cal.
       Rptr. 2d 642, 650 (Cal. Ct. App. 4th 1998), and Colorado appellate court
       decision, *People ex rel. K.D.*, 155 P.3d 634, 637 (Colo. Ct. App. 2007), to
       supports its position.

a distinction exists between "active efforts" as required by ICWA and "reasonable efforts" as required by state law. *Id.* ¶ 22 ("[We] hold that the 'active efforts' requirement of § 1912(d) imposes a higher standard than the 'reasonable efforts' of SDCL 26-8A-21."). Further, we wrote, "[i]nsofar as purely passive efforts could satisfy the reasonable efforts standard of SDCL 26-8A-21, they would not satisfy the 'active efforts' required by ICWA." *Id.* Generally, "'active efforts requires leading the horse to water[.]'" *Id.* ¶ 19 (quoting *In re J.S.*, 177 P.3d 590, 594 (Okla. Civ. App. 2008)). *See also Roy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 278 P.3d 886, 890 (Alaska 2012) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)) ("Active efforts occur when 'the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.'"). Conversely, "'[g]iving the parent a treatment plan and waiting for him to complete it would constitute passive efforts.'" *P.S.E.*, 2012 S.D. 49, ¶ 19, 816 N.W.2d at 116 (quoting *In re A.N.*, 106 P.3d 556, 560 (Mont. 2005)). Accordingly, we must determine whether DSS's efforts satisfy the "active efforts" threshold established in *P.S.E.*

[¶22.]     The State concedes that DSS's efforts were limited, but contends it "cannot be faulted for [F]ather's criminal choice which limited its ability to return the child[ren]." *In re D.G.*, 2004 S.D. 54, ¶ 17, 679 N.W.2d 497, 502. We agree. Although "[a] parent's incarceration does not automatically excuse DSS from exercising efforts to return the child[,]" we recognize that "a 'parent's incarceration limits DSS in its attempts to rehabilitate the family.'" *Id.* (quoting *In re A.S.*, 2000 S.D. 94, ¶ 23, 614 N.W.2d 383, 387) (additional citations omitted). Incarceration

narrows the options available "to prepare the parent for the return of a child." *Id.* Thus, "the fact of incarceration cannot be ignored." *Id.*

[¶23.] Further, the State argues that we should consider Father's history, the past services provided to the family, and the services provided to the non-incarcerated parent for purposes of maintaining the family unit. *See People ex rel. A.R.P.*, 519 N.W.2d 56, 60 (S.D. 1994); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009). Whether the services offered to a non-incarcerated parent can be considered when determining if active efforts have been made is an issue of first impression.

[¶24.] On several occasions, the Alaska Supreme Court has answered this question in the affirmative, allowing the court to consider efforts afforded to the non-incarcerated parent when determining whether the state has actively attempted to keep the family together. *See Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 463-64 (Alaska 2012); *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1021 (Alaska 2012); *Dashiell R.*, 222 P.3d at 850. The State urges us to adopt this approach, suggesting that it is consistent with the language of ICWA because 25 U.S.C. § 1912(d) requires that active efforts be made to "provide remedial services and rehabilitative programs designed to prevent the breakup of the *Indian family*." (Emphasis added.)

[¶25.] Based upon the facts before us, we conclude that the approach proposed by the State is in line with the policies of ICWA.[11] ICWA was enacted to prevent "the unjustified removal of Indian children from their families[.]" *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 55, 109 S. Ct. 1597, 1612, 104 L. Ed. 2d 29 (1989) (Stevens, J. dissenting). To this end, procedural safeguards were established requiring parties to satisfy stringent standards before effecting termination of parental rights. *Id.* at 57, 109 S. Ct. at 1612-13. Here, because of Father's incarceration, the rehabilitative options available for Father were limited, making it difficult for DSS to satisfy the standards required under ICWA. As a result, DSS provided numerous services and programs to Mother1 and Mother2. These efforts toward Mother1 and Mother2 were "an important aspect of [DSS]'s active efforts to keep the family together." *Dashiell R.*, 222 P.3d at 850. Father's parental rights may not have been terminated "had the children been able to stay with [either] mother." *Id.*

[¶26.] The circuit court considered DSS's efforts in their entirety. The court focused on DSS's efforts to the family, finding that DSS provided numerous services

---

11. Even if we rejected the State's approach, we think the services provided solely to Father are sufficient to support the court's finding that reasonable and active efforts were made to reunify the family. According to the record, DSS met with Father before he was incarcerated to develop a case plan. DSS offered transportation to Father so that he could complete a urinalysis and provided him contact information for a treatment counselor. After he was incarcerated, DSS provided Father with postage-paid envelopes; sent court records, letters, and pictures; developed and completed evaluations; talked to Father's case manager; included Father in concurrent planning meetings; sent Father a parenting packet; and facilitated a visit with the children at the Pennington County jail. Although these efforts were limited, based on Father's incarceration, they were active as opposed to passive.

to assist the family toward achieving reunification. These services included, in part, urinalysis tests, professional referrals, medical services, gas and clothing vouchers, bus passes, and transportation to family therapy and family visits. Additionally, DSS arranged two parental home studies for Mother2 and provided psychological evaluations, mental health referrals, foster care services, and residential placement for the children. DSS also provided all parents with postage-paid envelopes and updates on the children, facilitated visits in person and by letter, and completed initial family assessments and protective capacity assessments and evaluations. Finally, DSS performed team meetings, concurrent planning meetings, family locator services, kinship home studies, and interstate compact home studies. The court's findings are supported by the record and thus are not clearly erroneous.

[¶27.] The record demonstrates that DSS actively attempted to reunify the family. The services provided to Father, in conjunction with DSS's considerable efforts to help Mother1 and Mother2, satisfy the "active efforts" requirement under ICWA. Accordingly, the circuit court did not err in finding, beyond a reasonable doubt, that reasonable and active efforts were made to reunify the family.

## 2. Least Restrictive Alternative

[¶28.] Father argues that the circuit court erred in finding that termination of his parental rights was in the best interests of the children. Father contends that due to his limited incarceration period, legal guardianship would have been a less

restrictive alternative.[12] The State argues that Father's incarceration coupled with his past actions, the likelihood that he would not address the safety issues identified in his case plan in a timely manner, and the children's need for permanency and stability supports the court's conclusion that termination was the least restrictive alternative commensurate with the best interests of the children.

[¶29.]  "'Parental rights may be terminated if it is in the best interests of the child and is also the least restrictive alternative available.'" *In re L.S.*, 2012 S.D. 22, ¶ 12, 812 N.W.2d at 508 (quoting *In re E.L. & R.L.*, 2005 S.D. 124, ¶ 10, 707 N.W.2d 841, 845).  "'The best interests of the child are viewed from the child's, not the parents', perspective.'" *P.S.E.*, 2012 S.D. 49, ¶ 33, 816 N.W.2d at 119 (quoting *A.S.*, 2000 S.D. 94, ¶ 19, 614 N.W.2d at 386).

[¶30.]  Here, the court's determination was influenced by Father's incarceration.  In *People ex rel. J.I.H.*, the circuit court found that termination of the father's parental rights was the least restrictive alternative because he was incarcerated.  2009 S.D. 52, ¶ 22, 768 N.W.2d at 174.  There, the father was scheduled to be released from jail seven months after the dispositional hearing.  *Id.* ¶ 23.  The children's grandmother was willing to be a long-term placement option, her home study to be a foster care provider had been approved, and she only had to complete Pride classes to become a licensed foster care provider.  *Id.*  Additionally, the children's great-aunt expressed interest in being a placement option.  *Id.* However, neither of those options was considered.  *Id.*  Finally, the children's

---

12.  At the time of the dispositional hearing, Father had been incarcerated for a year and was scheduled to be released in nine months.

attorney did not advocate for termination of the father's parental rights and the ICWA expert testified that termination was premature because further efforts could be made to provide assistance to the father in light of the father's recent progress. *Id.* ¶ 24. On appeal, we reversed the circuit court, finding that under the circumstances, particularly the father's limited incarceration period, "legal guardianship would have been a less restrictive alternative until [the] [f]ather was able to care for his children." *Id.* ¶ 23.

[¶31.] As in *J.I.H.*, from the time of the dispositional hearing, Father was scheduled to be incarcerated for a limited period, nine months. Likewise, a maternal grandmother expressed interest in being a long-term placement option, her home study was approved, and she only had to meet a few conditions before placement could occur. Additionally, like in *J.I.H.*, a maternal great aunt was willing to be a placement option for the children.

[¶32.] This case, however, is distinguishable from *J.I.H.* because the children's attorney and the ICWA expert both testified that the best interests of the children would be termination of Father's parental rights. Father's criminal choice made him unavailable to his children. He has a history of violating parole due to marijuana use and currently faces possible rape charges in connection with the sexual abuse allegations brought by Stepdaughter2. "[Father]'s promises to conform to the standard of care for [his] children do not carry as much weight as [his] past actions of not properly caring for [his] children." *People ex rel. D.B.*, 2003 S.D. 113, ¶ 18, 670 N.W.2d 67, 73 (citation omitted).

[¶33.]     Moreover, unlike in *J.I.H.*, potential placement options were explored. Nevertheless, the children's attorney and the ICWA expert testified that adoption, rather than a guardianship, would be the least restrictive alternative because it would provide permanency and prevent interference from substance abusing parents whose chaotic lives are spent in and out of jail.  As we have previously noted, "[children] should not be required to wait for parents to acquire parenting skills that may never develop." *P.K.*, 2006 S.D. 17, ¶ 24, 711 N.W.2d at 256. "[G]uardianships, by their very nature, are temporary" and, as a result, "subject the children to further years of insecurity and lack of stability[.]" *Id.* ¶ 26 (citation omitted).  Based on these principles, the circuit court did not err in finding that termination of Father's parental rights was the least restrictive alternative commensurate with the children's best interest.

### Conclusion

[¶34.]     The record reflects that, based upon the circumstances, DSS actively attempted to reunify the family, but these efforts were unsuccessful.  The circuit court did not err in finding that the least restrictive alternative commensurate with the best interests of the children was termination of Father's parental rights.

[¶35.]     Affirmed.

[¶36.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, SEVERSON, and WILBUR, Justices, participating.