#29446-r-PJD
**2021 S.D. 41**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE PEOPLE OF THE STATE OF SOUTH DAKOTA
IN THE INTEREST OF C.H., Minor Child,
and Concerning C.M. and C.H., Respondents.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON R. ERICKSON
Retired Judge

\* \* \* \*

JASON R. RAVNSBORG
Attorney General

COURT ROPER
Special Assistant Attorney General
Pierre, South Dakota

Attorneys for petitioner and
appellee, State of South Dakota.


DOUGLAS E. KLUDT of
Churchill, Manolis, Freeman,
    Kludt, & Burns, LLP
Huron, South Dakota

Attorneys for respondent and
appellant, C.M.

\* \* \* \*

CONSIDERED ON BRIEFS
MAY 13, 2021
OPINION FILED **07/14/21**

#29446

DEVANEY, Justice

[¶1.] C.M. (Mother) appeals the dispositional order terminating her parental rights to C.H., asserting that the circuit court's findings and conclusions do not support termination. Because the evidence does not establish that active efforts were made to reunify Mother and C.H., we reverse and remand.

## Factual and Procedural Background

[¶2.] On July 5, 2018, the South Dakota Department of Social Services (DSS) began working with Mother and Father to assist them in providing a safe home for their daughter, C.H., born on September 8, 2017. DSS implemented a safety plan in August 2018 that would allow C.H. to remain in Mother and Father's custody, but on October 2, 2018, DSS took C.H. into protective custody because it determined that the dangers in the home remained. In particular, DSS had observed that C.H., a toddler, was left unsupervised or alone for extended periods of time and that her living conditions were unsafe.

[¶3.] On October 4, 2018, the State filed a petition alleging C.H. to be abused or neglected and attached an affidavit from DSS in support. The affidavit identified that Mother was 22 years old and that Father was 28 years old. It further reported that Mother and Father abuse marijuana and cannot control their addiction or substance abuse. DSS determined that Mother is an enrolled member of the Lower Brule Sioux Tribe; Father is eligible for enrollment as a member of the Crow Creek Sioux Tribe; and C.H. is eligible for enrollment in the Lower Brule Sioux Tribe. The Indian Child Welfare Act's (ICWA) definition of an "Indian child" includes a child who "is eligible for membership in an Indian tribe and is the

-1-

biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4)(b). Thus, C.H. is an Indian child, and ICWA applies to these proceedings.

[¶4.]     According to DSS, a family services specialist made an unannounced visit to Mother and Father's home at 9:00 a.m. on October 2, 2018, and found Mother and Father sleeping while C.H. stood awake in her playpen in a diaper overfull with urine. Mother told the specialist that she had taken sleeping pills for her sleeping disorder and the pills caused her to sleep late rather than care for C.H. The specialist observed hazards located near C.H.'s playpen and within C.H.'s reach and observed small wrappers and candy on the floor that C.H. could have put in her mouth. The specialist also reported that she saw an oscillating fan with a missing cover and prescription medication bottles in locations that C.H. could access. Finally, the specialist reported that she observed moldy bottles in C.H.'s diaper bag and living and dead cockroaches on the counters and walls of the kitchen. In DSS's view, neither Mother nor Father have the parenting knowledge, skills, or motivation to care for C.H., and their drug use renders them incapable of attending to C.H.'s basic needs.

[¶5.]     At a hearing on the petition on October 23, 2018, Mother and Father admitted to the allegations. Thereafter, the State asked the circuit court to adopt a report submitted by DSS containing information similar to that contained in DSS's affidavit submitted in conjunction with the State's petition. The report also related that both Mother and Father were currently unemployed and that Mother was suffering from unmanaged mental health needs. Further, DSS summarized the services provided to Mother, Father, and C.H. since C.H. was taken into protective

custody and noted that DSS had placed C.H. in temporary custody with Father's sister.

[¶6.] The circuit court adopted the findings in DSS's report and determined that the State proved by clear and convincing evidence that C.H. was abused and neglected by the actions or inactions of Mother and Father and that DSS had made active efforts to provide remedial services designed to prevent the breakup of the Indian family. The court further found that the least restrictive alternative in C.H.'s best interests would be continued legal and physical custody with DSS. For unknown reasons, the circuit court did not address DSS's request that it appoint an attorney to represent C.H.

[¶7.] A review hearing was held on December 18, 2018, and the State requested that the court maintain legal and physical custody of C.H. with DSS while the State worked toward reunification. The State also submitted an updated report to the court from DSS. Because this appeal concerns only Mother's parental rights to C.H., what follows focuses primarily on Mother.

[¶8.] In the report, DSS advised that Mother was still unemployed and could not control her addiction and substance abuse. DSS further reported that although Mother continued spending time with individuals known to abuse illegal drugs, she had begun weekly counseling sessions at Community Counseling Services. In regard to visitation, DSS related that although Mother and Father had been offered multiple visits with C.H. while she was in kinship care in Redfield, South Dakota, they only attended two visits. DSS noted that the parents participated in video chats with C.H. a couple of times, Mother attended an in-person visitation at DSS's

office, and both parents exercised a supervised visit with C.H. in their home. At the conclusion of the report, DSS again requested that the court appoint an attorney to represent C.H. Once again, the court did not address this request.

[¶9.] After the December 2018 review hearing, the circuit court issued an order continuing legal and physical custody with DSS, and DSS continued to work with Mother and Father toward reunification. Between February and December 2019, the circuit court held multiple review hearings, and DSS submitted updated reports to the court regarding Mother and Father. The record reveals that during this period, Mother and Father often did not avail themselves of the programs or services offered by DSS. For example, Mother did not complete parenting classes or a chemical dependency evaluation. Also, although she began counseling, she eventually quit and gave no reason for why she stopped. In DSS's view, Mother and Father did not know how to parent C.H., and Mother did not understand how her behaviors put C.H. at risk. However, DSS noted that it was apparent C.H. was very attached to Mother during visitations.

[¶10.] In April 2019, DSS reported that Mother and Father admitted to using marijuana in March and that the two continued to reside in the same apartment with "life threatening living arrangements." However, in June 2019, DSS reported that Mother claimed she was over a month sober from marijuana and that she and Father separated and were no longer living together. In September 2019, DSS reported that Mother claimed to still be sober from marijuana and still separated from Father. According to DSS, Mother was living with her boyfriend, and the two of them were attending parenting classes together.

[¶11.] At the beginning of the December 2019 review hearing, the State informed the court that it had intended to seek termination of Mother's and Father's parental rights. However, the State then advised that in light of an email from counsel for Mother proposing that Mother work with a behavioral interventionist, the State would agree to set a termination hearing for March 2020. The State noted that if Mother was successful in that period, the State "wouldn't seek" termination. The court agreed to set a hearing for March 2020. It then addressed Mother, noting that she had "more work . . . to do" and that it was "really up to [Mother] now." The court also informed Mother that DSS has offered her "the services that [it has] available[,]" and now Mother "need[s] to take advantage of" working with Community Counseling Services.

[¶12.] The circuit court's order following the review hearing reflects that the court adopted DSS's December 3, 2019 report; however, the record does not contain this report. Also, although the court's order provides that "reasonable and active efforts will be made to reunite the family[,]" the court further ordered, inconsistently, that "no further efforts be made by the Department of Social Services to reunite [C.H.] with" Mother or Father.[1] The court set a final dispositional hearing for March 17, 2020.

[¶13.] It is undisputed that DSS made no further efforts to reunify Mother and C.H. after the December 2019 hearing and that no further judicial proceedings occurred in the case until September 18, 2020. The March 2020 termination

---

1. The transcript from the December 2019 hearing does not contain a request from the State for an order directing DSS to cease all efforts toward reunification.

hearing was moved to July due to the COVID-19 pandemic, and for reasons not specified in the record, the July hearing was also continued. The court heard testimony at the dispositional hearing from an ICWA expert, a DSS family services specialist, Mother, C.H.'s maternal grandmother, and Mother's counselors.

[¶14.]     The ICWA expert, Ray Cournoyer, opined that based on his review of the information provided to him by the State, including DSS's reports, it would be detrimental for C.H. to remain in the custody of her parents. The DSS family services specialist, Dana Duvall, similarly believed that Mother and Father should not have custody of C.H. According to Duvall, the conditions that led to C.H.'s removal from the home continued to exist despite DSS's reasonable and active efforts to achieve a permanent plan of reunification. However, Duvall acknowledged that she had not observed Mother's home in the past *nine months* and had no personal knowledge about Mother's current living conditions.

[¶15.]     Valere Walton, a board certified behavioral analyst with Community Counseling Services, testified that she began working with Mother in October 2019 on a behavioral intervention plan to address Mother's issues, such as: completing tasks necessary for independent living, poor self-care and self-advocacy, and irregular sleeping patterns. Walton met with Mother four days a week at the same time each day to ensure Mother was working toward her goals. Walton further testified that Mother's mother, J.M., assisted in keeping her accountable. According to Walton, at first Mother did a poor job in making progress; she had no consistency or reliability. However, Walton testified that as they continued working together during the 90 days (December 2019 to March 2020), Mother began to improve and

complete required tasks. Walton believed that Mother put in a lot of effort during the 90-day plan and showed marked improvement. She further testified that Mother "was able to take care of changing a lot of aspects of her life, including relationships." Mother had completed parenting classes in March 2020 prior to the initially set dispositional hearing. Also, by the time of the rescheduled September 2020 dispositional hearing, Mother had completed her drug treatment counseling.

[¶16.] Walton further testified that although the intervention plan ended after 90 days, she continued working with Mother, as part of "generalization, basic maintenance," to make sure Mother "was able to care for herself[, c]are for her home[, a]nd continue to follow through with the things that she said she would do." Walton communicated with Mother multiple times a week and testified that she did not observe any indication that Mother was using drugs or alcohol. Walton also observed where Mother currently lived, albeit virtually because of the pandemic. She testified that Mother lived with her mother, that the home is "picked up[,]" "organized[,]" "100 percent better than" before, child-proofed, and would be suitable for a three-year old. Walton had observed Mother's video interactions with C.H., and in her view, C.H. "loves her mom" and there is a bond there. She also testified that she helped Mother fill out the paperwork for a divorce from Father. Walton described their marriage as a "very, very poor relationship."

[¶17.] When asked whether Mother "is capable of taking care of her daughter[,]" Walton replied, "I would feel way more comfortable with her having her daughter now. I think she could do it." The court asked Walton "how much time it would take before [Mother] is ready to live on her own and take care of [C.H.'s]

needs[,]" noting that Mother has already had two years. Walton replied that with continued work, she would give Mother another six months, but that it could take less time as Mother "is very motivated to get [C.H.] back[.]" When asked whether Walton had tried to communicate Mother's progress to DSS, Walton replied that she had, but that DSS made "no attempt to further contact [Mother.]" According to Walton, "[t]here was a lot of resistance and a lot of desire to continue to terminate [Mother's] parental rights."

[¶18.]     Mother's mother, J.M., who was 60 years old at the time, testified about the condition of the apartment she and Mother lived in. She noted that they have lived together for a year and a half and testified that their home would be suitable for her, Mother, and C.H. She provided a letter from their landlord confirming that the apartment did not have bugs. According to J.M., she believes Mother is able to care for C.H.

[¶19.]     Mother acknowledged that she could have worked harder when DSS was involved. She also recognized that she only recently completed parenting classes and drug treatment. However, she testified that she learned a lot from the classes and treatment. She also claimed that she is in a better position because of her work with Walton than when DSS was working with her. She requested that she be given one-on-one time with C.H. to prove to DSS that she can appropriately care for her.

[¶20.]     At the conclusion of the hearing, the State requested termination of the parental rights of both Mother and Father. In regard to Mother, the State asserted that "[e]nough is enough[,]"noting that Mother has had over two years to

prove she can parent C.H. and despite that she has not completed what was asked of her. The State further claimed that even though Mother had made progress in working with Walton, Mother would still need more time before she could properly parent C.H. Thus, according to the State, it would be unfair for C.H. to wait any longer.

[¶21.] In response, counsel for Mother asserted that the evidence "should give anyone pause to even consider[] terminating this young lady's rights." Counsel conceded that Mother completed some requirements shortly before the termination hearing; however, counsel referred to the fact that Mother was young and uneducated. Counsel also claimed that the location of C.H.'s foster home[2] in another town made visitation difficult given that Mother does not have transportation. Counsel argued that Mother had taken significant steps to understand what was necessary to parent C.H. and pointed out that there was nothing in the record showing that Mother's current apartment is unsuitable for C.H. According to counsel, DSS "basically gave up" when it should have gotten "back in the game here and acknowledged that [Mother] has made some real progress." Counsel requested that the court deny termination.

[¶22.] In its oral ruling, the circuit court noted that Mother had made some improvements. However, the court concluded that Mother did not address her mental health issues, finances, housing, or employment. The court acknowledged that Walton believed Mother should be given more time, but in the court's view,

---

2.      C.H. remained in the kinship placement with her paternal aunt, who had completed the necessary classes to become a licensed foster parent.

"[t]he truth of the matter is [Mother] has never provided for [C.H.'s] basic needs" and "has not shown that she can provide for [her] basic needs." The court therefore ordered that Mother's parental rights be terminated.

[¶23.] In its written findings of fact, conclusions of law, and order, the court determined beyond a reasonable doubt that the State "made reasonable and active efforts to provide remedial services designed to prevent the breakup of the family and those rehabilitative programs have been unsuccessful." The court also found that Mother "failed to follow the recommendations of [DSS,]" is "unfit," and has never provided for C.H.'s basic needs. According to the court, the conditions that led to C.H.'s removal continue to exist and "[t]here is little likelihood that these conditions will be remedied to allow [C.H.] to be returned to the custody of [Mother.]" The court then indicated that it "carefully balanced the rights of the child, the parents, the State and the public" before determining beyond a reasonable doubt that termination of Mother's parental rights was the least restrictive alternative commensurate with C.H.'s best interests.

[¶24.] Mother appeals, asserting that the circuit court's findings of fact and conclusions of law do not support termination of her parental rights.

**Analysis and Decision**

[¶25.] Mother contends the circuit court clearly erred in finding that the conditions that led to C.H.'s removal continued to exist at the time of the dispositional hearing. She further claims the court erred in concluding that "[a]ppropriate services to the family have failed" and that Mother "failed to follow the recommendation of the Department of Social Services." According to Mother,

although she did not complete the requirements on DSS's timetable, she successfully addressed her marijuana issues, has "greatly improved her housing[,]" has removed herself from the negative influences identified by DSS, and has received parenting education and behavior modification training. She therefore asserts the evidence does not support termination and that termination was not the least restrictive alternative commensurate with C.H.'s best interests.

[¶26.]         "[W]e review the circuit court's findings of fact for clear error." *In re S.H.E.*, 2012 S.D. 88, ¶ 18, 824 N.W.2d 420, 425. "The circuit court's factual findings are clearly erroneous if 'we are left with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *In re L.S.*, 2012 S.D. 22, ¶ 12, 812 N.W.2d 505, 508). Under 25 U.S.C. § 1912(d), "[a]ny party seeking . . . termination of parental rights to[ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Proof of active efforts must exist beyond a reasonable doubt, and whether active efforts have been provided is a mixed question of law and fact reviewed de novo. *S.H.E.*, 2012 S.D. 88, ¶¶ 18–19, 824 N.W.2d at 425–26.

[¶27.]         Although the circuit court found beyond a reasonable doubt that active efforts were provided to prevent the breakup of the Indian family and that the efforts were unsuccessful, it is undisputed that DSS ceased providing any efforts toward reunification after the December 2019 hearing. This means that from December 2019 to September 2020 *no efforts* were made by DSS to provide Mother

remedial services or rehabilitative programs and *no efforts* were made to reunite C.H. with Mother. The circuit court's finding of fact to the contrary—that DSS "has been providing active efforts to this family since October 2, 2018; including in-home services to prevent placement, and ongoing services to allow safe return of the child to no avail"—is not supported by the record. To the extent this finding suggests that DSS's efforts were ongoing up to the point of the dispositional hearing, it is clearly erroneous.

[¶28.]     More importantly, however, this Court has held that the active efforts requirement under ICWA imposes a heightened responsibility on DSS. *In re P.S.E.*, 2012 S.D. 49, ¶ 22, 816 N.W.2d 110, 117–18. Therefore, DSS cannot simply give a parent a case plan and wait for the parent to complete the plan. *Id.* ¶ 19, 816 N.W.2d at 116. As one court explained, "[t]he client should not be required to develop his or her own resources toward bringing the plan to fruition." *In re D.J.S.*, 456 P.3d 820, 838 (Wash. Ct. App. 2020). Rather, active efforts require that DSS take the parent through the steps of the case plan to prepare the parent for reunification. *See* 25 C.F.R. § 23.2 (explaining that "active efforts" "involve[s] assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan").

[¶29.]     Here, the record reveals that the circuit court ordered in December 2019 that DSS cease all efforts toward reunification. Thereafter, Mother's existing counselor and her lawyer facilitated Mother's efforts to work with a behavioral analyst in an effort to develop the skills necessary to parent C.H. DSS did not direct Mother toward any further services or programs, let alone make active efforts

to aid her in developing the resources necessary to satisfy the case plan between December 2019 and the dispositional hearing in September 2020. Additionally, DSS did not facilitate any visits between Mother and C.H. after December 2019.

[¶30.] The State contends that the circuit court "was justified in relieving DSS of its efforts burden" in December 2019 because the State had proven that up to that point active efforts were made as required under ICWA. However, the State has not identified any authority allowing the circuit court to excuse DSS from continuing to make active efforts when the State agreed to continue the dispositional hearing so that Mother could continue working with her counselors to remedy the problems that led to C.H.'s removal.

[¶31.] In *In re J.S.B., Jr.*, the circuit court had relieved DSS of providing further remedial services or rehabilitative programs to reunite an Indian child with his parents in December 2002 despite the fact that the final dispositional hearings were not held until April 15 and May 12, 2003. 2005 S.D. 3, ¶¶ 9–10, 691 N.W.2d 611, 615. In its final order, the circuit court justified its decision that DSS did not need to provide active efforts because, in the court's view, the Adoption and Safe Families Act (ASFA) applied. *Id.* ¶ 9. Under ASFA, the State can be relieved "from making merely perfunctory remedial efforts in cases where a court has found that the parent has subjected the child to aggravated circumstances of abuse or neglect." *Id.* ¶ 17, 691 N.W.2d at 617.

[¶32.] On appeal, this Court held that the circuit court erred in relying on ASFA to eliminate the State's obligation to provide active efforts after December 2002. *Id.* ¶ 29, 691 N.W.2d at 621. The Court noted that ICWA "seeks to prevent

capricious severance" of the "familial, tribal, and cultural ties" and established the minimum standards governing the removal of Indian children from their families and placement in foster or adoptive homes. *Id.* ¶¶ 14, 17, 691 N.W.2d at 616–17. In contrast, "ASFA identifies permanency as a major consideration in promoting the best interests of children." *Id.* ¶ 17, 691 N.W.2d at 617. The Court further distinguished ICWA and ASFA. It noted that ASFA requires "reasonable efforts" to be made toward reunification with certain statutory exceptions, while ICWA requires, *without exception*, "that state agencies make 'active' efforts to provide services aimed at the prevention of a family breakup." *Id.*

[¶33.] Ultimately, the Court did not reverse the final dispositional order in *J.S.B.* because the record revealed that DSS continued to provide active efforts toward reunification despite the circuit court's December 2002 order. *Id.* ¶ 29, 691 N.W.2d at 621. Here, in contrast, it is undisputed that DSS made *no efforts* toward reunification after December 2019. Therefore, while it does not appear from the record that the circuit court relied on ASFA in relieving DSS of its obligation to make active efforts under 25 U.S.C. § 1912(d), the circuit court nevertheless erred in terminating Mother's parental rights on the basis that DSS had been making active efforts since the inception of the case and that such efforts proved unsuccessful.

[¶34.] Additionally, and as a result of the circuit court's order directing that DSS make no further efforts despite the continuation of the dispositional hearing, neither the State nor DSS had any knowledge about what had transpired with Mother in the nine months leading up to the hearing. The only evidence in the

record regarding Mother's current circumstances and living conditions at the time of the dispositional hearing came from Mother and her witnesses. Importantly, much of this evidence was contrary to the factual underpinnings upon which DSS, and ultimately the circuit court, relied on to support termination. In fact, Duvall acknowledged that she had not visited Mother's apartment since January 2020, and she had not communicated with Walton about the progress Mother had made since the December 2019 hearing.

[¶35.] This is not the typical case wherein the parent asks "for repeated chances to forestall termination of parental rights after minimal or no improvement in parenting" despite DSS's efforts to rehabilitate and reunite the family. *See In re L.R.*, 2014 S.D. 95, ¶ 9, 857 N.W.2d 886, 889. Rather, this is a unique case involving the cessation of active efforts by DSS some nine months prior to the dispositional hearing despite Mother's ongoing work with counselors on her own accord, and a clearly erroneous finding by the circuit court that DSS had been providing active efforts toward reunification since October 2, 2018. Therefore, the circuit court erred in terminating Mother's parental rights in the absence of contemporaneous evidence to support its decision.

[¶36.] Because this error requires a remand, we take this opportunity to address additional errors that occurred below to prevent their reoccurrence. First, the circuit court erred when it failed to appoint an attorney to represent C.H. Under SDCL 26-8A-18, "the court *shall* appoint an attorney for any child alleged to be abused or neglected in any judicial proceeding." (Emphasis added.) Here, although DSS requested that an attorney be appointed to represent C.H. in its

report prior to the adjudicatory hearing and in every report to the court thereafter, neither the court nor the parties mentioned or addressed this request until the final dispositional hearing when the court inquired about who was representing C.H. The State responded that C.H. was less than a year old when the case started, and an attorney had never been appointed for her. No further discussion was held, and the court moved forward with the hearing. The statutory provision requiring that children in abuse and neglect proceedings be appointed counsel is not discretionary or dependent on the age of the minor children. Therefore, the circuit court is directed to appoint an attorney to represent C.H. as soon as the case is remitted.

[¶37.]    Second, although not raised as an issue on appeal, there are glaring defects involving ICWA mandates in the underlying proceeding that we cannot ignore. Under 25 U.S.C. § 1912(f), "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in *serious emotional or physical damage* to the child." (Emphasis added.) Our prior decisions have recognized that ICWA does not require that an expert's testimony track the statutory language verbatim. *See In re A.B.*, 2016 S.D. 44, ¶ 26, 880 N.W.2d 95, 104. Here, however, the ICWA expert called by the State opined only that continued custody could be "detrimental" to C.H., and like DSS, he was not basing his opinion on Mother's current circumstances. In fact, when questioned by Mother's counsel, he admitted that his opinion would be affected if he had known that Mother had completed drug and alcohol treatment and parenting classes, was

separated from Father, and was working with counselors to modify her behaviors. Moreover, although the court's order contained the exact language from § 1912(f), the court did not identify any evidence in the record to support its ruling, and the court's written findings only stated that "[t]here is evidence showing that *potential harm* could result to the child were she to be returned to" Mother. (Emphasis added.)

[¶38.]       Finally, the circuit court's determination that termination of Mother's parental rights was the least restrictive alternative commensurate with C.H.'s best interests with due regard to the rights of Mother was perfunctory at best. Notably, in DSS's September 2019 report to the court, DSS had indicated that C.H.'s paternal aunt, with whom C.H. had been residing since she was removed from her parents' custody, was willing to enter into a guardianship because she wanted to see C.H. reunified with her parents. In the report DSS submitted to the court for the dispositional hearing, there was no indication that the paternal aunt was no longer willing to consider such a guardianship. Yet, the court did not enter any findings related to whether an alternative besides termination of Mother's parental rights existed.[3]

[¶39.]       "Under SDCL 26-8A-27, the court must find, by clear and convincing evidence, that termination is the least restrictive alternative 'commensurate with the best interests of the child with due regard for the rights of the parents, the public and the state[.]'" *A.B.*, 2016 S.D. 44, ¶ 28, 880 N.W.2d at 104 (quoting the

---

3.       When the DSS witness was questioned at the dispositional hearing about whether the paternal aunt wanted to adopt C.H., the State objected, arguing this topic was not relevant. The court sustained the objection.

statutory language). The best interest of the child is viewed from the child's perspective, not the parent's. *S.H.E.*, 2012 S.D. 88, ¶ 29, 824 N.W.2d at 428. In this vein, we have often observed that "[children] should not be required to wait for parents to acquire parenting skills that may never develop." *Id.* ¶ 33, 824 N.W.2d at 429 (quoting *In re P.K.*, 2006 S.D. 17, ¶ 24, 711 N.W.2d 248, 256). We have further noted that "'guardianships, by their very nature, are temporary' and, as a result, 'subject the children to further years of insecurity and lack of stability[.]'" *Id.* (quoting *P.K.*, 2006 S.D. 17, ¶ 26, 711 N.W.2d at 257). However, ICWA also "acknowledges that Indian children should retain familial, tribal, and cultural ties" and affords "different protections for parents whose rights are subject to termination[.]" *J.S.B.*, 2005 S.D. 3, ¶¶ 14, 21, 691 N.W.2d at 616, 619. In the event the circuit court, on remand, is once again confronted with the question whether termination of Mother's parental rights is the least restrictive alternative commensurate with C.H.'s best interests, the court must apply the correct legal standards. The circuit court must also support its decision with adequate findings of fact.

## Conclusion

[¶40.] The circuit court's order terminating Mother's parental rights to C.H. is reversed. On remand, the circuit court is directed to appoint an attorney to represent C.H. and require that the State and DSS follow the dictates of both ICWA and applicable South Dakota law in reassessing Mother's and C.H.'s current circumstances.

[¶41.] Reversed and remanded.

[¶42.]    JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.