#28545-a-DG
**2018 S.D. 78**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

The People of the State of South Dakota in the
Interest of M.D., K.D., R.T.A., M.E.S. and
M.C., Minor Children and Concerning T.C., C.D., M.E.S. and
S.T.A., Respondents and Rosebud Sioux Tribe and
Cheyenne River Sioux Tribe, Intervenors.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE SUSAN M. SABERS
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General
Pierre, South Dakota

LAURA RINGLING
Special Assistant Attorney General
Department of Social Services
Pierre, South Dakota

Attorneys for petitioner and
appellee State of South Dakota.

RICHARD L. JOHNSON
Sioux Falls, South Dakota

Attorney for respondent and
appellant S.T.A.

\* \* \* \*

CONSIDERED ON BRIEFS
ON SEPTEMBER 14, 2018

OPINION FILED **11/20/18**

#28545

GILBERTSON, Chief Justice

[¶1.]    S.T.A. (father) appeals a dispositional order terminating his parental rights over R.T.A. (child), his four-year-old son.  We affirm.

**Facts and Procedural History**

[¶2.]    T.C. (mother) is twenty-five years old and is an enrolled member of the Cheyenne River Sioux Tribe. At the time this matter began in 2016, mother had four children by three different fathers.  Mother's two older children were four-year-old twins.  Mother's third child, the subject of this case, was about two.  Her fourth child was around a year old.  Mother was unemployed, homeless, and moved around with her family and occasional boyfriends between Huron, Mitchell, and Eagle Butte.  Mother and the family lived in government-assisted housing, roomed with friends, and moved in with mother's mother in Eagle Butte for a time.  Eventually, the family stayed with the sister of one of mother's boyfriends in Sioux Falls.

[¶3.]    Mother's fifth child was born on November 11, 2016 in Sioux Falls.  Mother's cord screening was positive for THC, amphetamine, and methamphetamine and the matter was reported to the South Dakota Department of Social Services (DSS).  Mother admitted to DSS and law enforcement that she was smoking methamphetamine the day before the child's birth.

[¶4.]    Mother's four older children, including child, were still staying with mother's boyfriend's sister.  Law enforcement visited the sister's residence and removed the children from her care.  The sister initially refused the officers entry into her home, but ultimately brought the children out to them.  The children were

poorly dressed and filthy. All five of the children were eventually placed into DSS custody due to mother's drug use and the lack of appropriate caretakers for them.

[¶5.] A petition alleging abuse and neglect of the children was filed on November 23, 2016. Because of the children's Native American heritage, notice was provided to the Rosebud Sioux Tribe and to the Cheyenne River Sioux Tribe pursuant to the Indian Child Welfare Act (ICWA).[1] Both tribes filed motions to intervene that were granted by the trial court. DSS remained in contact with the tribes and provided them with documentation and updates throughout the remainder of the case.

[¶6.] After removal of the children, mother began to go through the steps of a case plan requiring chemical dependency evaluations, treatment, urinalyses, and establishment of stable housing. DSS initially had difficulty contacting any of the children's fathers.

[¶7.] DSS made contact with father in December 2016. Father was on probation for simple assault and escape offenses and was working in Pierre. When DSS asked father about visiting child, he told the worker that he would get back to her. When the worker offered to bring child to Pierre to visit, father replied that it was unnecessary because he would be moving to Sioux Falls and could see child then. DSS did not hear from father again for about three months.

---

1. Father is affiliated with the Cheyenne River Sioux Tribe, but is not an enrolled member. One of the other fathers is an enrolled member of the Rosebud Sioux Tribe and his child with mother is eligible for enrollment in that tribe. Another father is an enrolled member of the Standing Rock Sioux Tribe, but his two children with mother do not have a sufficient blood quantum for membership in that tribe. All of the children are eligible for enrollment in the Cheyenne River Sioux Tribe.

[¶8.]     The children were adjudicated abused and neglected as to both parents in early 2017. Father did not appear for his adjudicatory hearing. In June 2017, DSS learned of father's incarceration in the Minnehaha County Jail on a probation violation for noncompliance with 24/7 monitoring. DSS routinely met with father while he was incarcerated to update him on child and to inform him of the services available to him in jail. DSS also arranged visitations with child. Father indicated that he was completing chemical dependency treatment at the jail. Meanwhile, mother completed outpatient treatment, relapsed, and failed to begin aftercare as recommended. Mother continued to struggle with methamphetamine and marijuana use throughout the duration of the case and never did establish stable housing.

[¶9.]     In October 2017, Father received a four-year sentence on his probation violation and was returned to the penitentiary. In addition, federal charges were pending against him for arson and third-degree burglary on the Cheyenne River Sioux Reservation. The dispositional hearing was set for that October but was continued by stipulation of the parties until January 2018. Father's return to the penitentiary led to missed visitations with child until father completed paperwork necessary to resume visitations shortly before the dispositional hearing.

[¶10.]     The dispositional hearing took place on January 11 and 12, 2018. Mother appeared for the start of the hearing but left after lunch and did not appear for the remainder of the proceedings. Mother was represented by appointed counsel throughout the hearing. Father appeared personally and by appointed counsel. Appointed counsel also appeared for the children. The Rosebud Sioux Tribe

appeared and participated by telephone through its agent. Despite proper notice, the Cheyenne River Sioux Tribe did not participate in the dispositional hearing. The hearing included testimony by a qualified ICWA expert.

[¶11.] The trial court rendered an oral decision on January 17, 2018, that was later incorporated by reference in its findings of fact and conclusions of law. The court found that, despite the provision of numerous services to mother and father, mother's drug use, homelessness, and lack of resources to meet the children's needs persisted. The court further found that father failed to act as a caregiver to child in any meaningful way. The court went on to conclude that: the parents' continued custody of the children would likely result in serious emotional or physical damage to them; active efforts were made to prevent the breakup of the family, but were unsuccessful; and termination of all parental rights was the least restrictive alternative in the children's best interests. The court filed its findings of fact, conclusions of law, and dispositional order terminating all parental rights on January 31.[2] Father appeals.

### Issue

[¶12.] **Whether the trial court erred in terminating father's parental rights because DSS failed to make active efforts to prevent the breakup of the Indian family.**

### Standard of Review

[¶13.] Termination of parental rights in an ICWA case requires a showing of "active efforts . . . to prevent the breakup of the Indian family[.]" *People ex rel.*

---

2. Because of uncertainty over the paternity of one of the children, the parental rights of the father of that child were terminated in a later order designating the father as "unknown."

*J.S.B., Jr.*, 2005 S.D. 3, ¶ 15, 691 N.W.2d 611, 617 (quoting 25 U.S.C. § 1912(d) (1978)). Active efforts must be proven "beyond a reasonable doubt." *People ex. rel. S.H.E.*, 2012 S.D. 88, ¶ 19, 824 N.W.2d 420, 426 (quoting *People ex rel. J.I.H.*, 2009 S.D. 52, ¶ 17, 768 N.W.2d 168, 172). "[W]hether active efforts were provided . . . is a mixed question of law and fact subject to de novo review" by this Court. *Id.* ¶ 18, 824 N.W.2d at 425 (quoting *People ex rel. P.S.E.*, 2012 S.D. 49, ¶ 15, 816 N.W.2d 110, 115).

## Analysis

[¶14.] Father argues that active efforts were not provided because DSS did not make active efforts to place child with his Native American family on the Cheyenne River Reservation. Instead, after removing the children from mother's care, DSS placed them in non-Native American foster care in the Sioux Falls area where they remained for the duration of the case.[3] Father argues that this violated ICWA placement preferences[4] set forth as follows:

---

3. The children were initially separated into groups and placed into different foster homes. Later, they were all placed together in one foster home.

4. We are aware of the recent decision of the United States District Court for the Northern District of Texas holding parts of ICWA, including its placement preferences, unconstitutional. *Brackeen v. Zinke*, No. 4:17-cv-oo868-0, 2018 WL 4927908 (N.D. Tex. Oct. 4, 2018). However, the decision may be appealed and ICWA has previously been upheld by the United States Supreme Court. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989). Moreover, we are not bound by the decision of the District Court in Texas and must presume that ICWA *is* constitutional. *U.S. v. v. Nat'l Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S. Ct. 594, 597, 9 L. Ed. 2d 561 (1963) (noting that Acts of Congress have "strong presumptive validity'); *State v. Rolfe*, 2013 S.D. 2, ¶ 13, 825 N.W.2d 901, 905 ("Statutes are presumed to be constitutional[.]").

**(b) Foster care or preadoptive placements; criteria; preferences**

Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

25 U.S.C. § 1915(b) (2012).[5]

[¶15.] In support of his argument, father relies primarily on *In re Welfare of M.S.S.*, 465 N.W.2d 412 (Minn. Ct. App. 1991). In that case, the Minnesota Court of Appeals held that active efforts were not proven beyond a reasonable doubt where a father's proposal to place his child permanently with his Native American brother and sister-in-law was not considered by the trial court before it terminated his

---

5.  Father also cites federal guidelines corresponding with section 1915(b) that contain similar language on placement preferences. *See* Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146-02, F.2, F.3 (Feb. 25, 2015). Federal regulations continue to reflect the same placement preferences. *See* 25 C.F.R. § 23.131 (2016).

parental rights.[6]  However, the Minnesota court distinguished *M.S.S.* in *In re Welfare of Children of J.B.,* 698 N.W.2d 160, 170 (Minn. Ct. App. 2005), noting that it reversed and remanded the termination of parental rights in *M.S.S.* "where the proposed custodians were not identified until after the trial started, *but were specific members of the child's tribe who were licensed foster parents and recommended to be custodians by the child's tribe.*"  (Emphasis added).  In contrast, the court observed that the proposed custodian in *J.B.* "was found not credible, other proposed custodians were not identified, and the child's tribe did not endorse the placement [the] father proposed."  *Id.*[7]

[¶16.]        This case is more like *J.B.* than *M.S.S.* in terms of credibility issues, failure to identify proposed custodians, and lack of tribal endorsement of father's placement proposal.  Before the dispositional hearing, Father did provide DSS with

---

6.      The State's brief asserts that "courts across the country have been . . . skeptical" of *M.S.S.*'s ruling."  However, with the exceptions of *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 169 (Minn. Ct. App. 2005) and *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767 (Alaska 2012), discussed *infra*, the cases the State cites supporting that point appear to focus on the appropriate standard of proof for active efforts.  *See In re Michael G.*, 74 Cal. Rptr. 2d 642, 649 (Cal. Ct. App. 1998); *State, ex rel. Children, Youth and Family Dep't* v. *Yodell B.*, 367 P.3d 881, 884 (N.M. Ct. App. 2015); *In re Dependency of A.M.*, 22 P.3d 828, 832-33 (Wash. Ct. App. 2001); *In re Vaughn R.*, 770 N.W.2d 795, 810 (Wis. Ct. App. 2009).  This Court has settled that question by adopting the reasonable doubt standard.  *S.H.E.*, 2012 S.D. 88, ¶ 19, 824 N.W.2d at 426.  The issue here is whether the State met the appropriate standard of proof, not what the standard should be.

7.      The Minnesota court similarly distinguished *M.S.S.* in an earlier 2003 unpublished opinion, noting in that case that, "unlike *M.S.S.* (a) in district court, the tribe argued *against* mother's proposed placement; (b) the district court actually addressed (and rejected) mother's proposed placement; and (c) the tribe [was] participating in [the] appeal and continu[ing] to *oppose* mother's proposed placement."  *In re Welfare of the Child of Wilson*, No. C6-02-1940, 2003 WL 21266612, at *2 (Minn. Ct. App. June 3, 2003).

the names of three of his relatives as placement options for the children. However, only father's sister from Pierre responded to DSS's letters by calling in to participate in a planning meeting. DSS attempts to follow-up with the sister were thwarted by the disconnection of her telephone and the return of three subsequent letters to her.

[¶17.] During the dispositional hearing itself, father presented testimony from his great aunt who lived on the Cheyenne River Reservation. The aunt testified that she and some of father's other relatives from the reservation received letters from DSS about child's placement and were interested in custody of child. However, the aunt also testified that the letters stated that a custodian would have to take custody of all the children and not just child. The aunt further testified that she telephoned DSS and was told the same thing. Therefore, none of father's relatives pursued custody. DSS records, however, did not show any contact by the aunt responding to its letters of inquiry, and a copy of a DSS letter to the aunt referred only to child and not the other children as she testified. A DSS worker also testified that DSS was conducting a home study of the grandmother of two of the other children to be their custodian because she replied to its letter of inquiry. Accordingly, the trial court found "[n]o credible evidence" supported father's argument that his relatives were "denied placement of [child] due to a requirement that one [custodian] accept all five children."

[¶18.] The record also does not show that father's aunt or other relatives were licensed foster parents or that any of them were recommended to be custodians by child's tribe as were the proposed custodians in *M.S.S.* To the contrary, despite

notice, child's tribe did not appear for the dispositional hearing or otherwise endorse any placement that father proposed. Thus, like the Minnesota court in *J.B.*, we reject father's argument that DSS failed to comply with ICWA placement preferences by failing to place child with any of father's relatives. *See J.B.*, 698 N.W.2d at 170.

[¶19.] The State also challenges father's premise that compliance with ICWA placement preferences is a factor in determining whether active efforts were made to prevent the breakup of the family. In support of its argument, the State cites the Alaska case *David S. v. State, Dep't of Health and Social Servs.,* 270 P.3d 767 (Alaska 2012). In that case, an incarcerated father, like father here, argued that active efforts were not made before terminating his parental rights because Alaska's Office of Children's Services (OCS)[8] did not comply with ICWA placement preferences when it placed the child at issue with foster parents instead of with the father's mother. Rejecting the father's argument, the Alaska court observed that ICWA's placement preferences are not among the provisions listed in 25 U.S.C. § 1914 (2012) for challenging terminations of parental rights.[9] *David S.*, 270 P.3d at

---

8. Alaska's agency counterpart to DSS.

9. 25 U.S.C. § 1914 (2012) provides:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

(continued . . .)

779.  The court concluded that, "[u]nder ICWA, then, a termination of parental rights may not be invalidated by showing a violation of the ICWA placement preferences."  *Id.*[10]

_____

(. . . continued)

      Placement preferences are contained in 25 U.S.C. § 1915 (2012).

10.    The Alaska court also noted a number of additional courts addressing the question that reached the same conclusion.  *See Doe v. Mann*, 285 F. Supp. 2d 1229, 1240 (N.D. Cal. 2003) ("There is no evidence in the text of section 1915, the structure of ICWA or the legislative history that Congress intended to create a cause of action for" violation of placement preferences.); *Navajo Nation v. Super. Ct. of the State of Wash. for Yakima Cty.*, 47 F. Supp. 2d 1233, 1242 (E.D. Wash. 1999) ("Section 1915, while setting out the preferences for placement of Indian children, does not expressly permit a private cause of action" to invalidate termination decisions as section 1914 does for certain other ICWA violations.); *In re Appeal in Maricopa Cty. Juvenile Action No. JS-7359*, 766 P.2d 105, 108-09 (Ariz. Ct. App. 1988) ("Even if the Indian Child Welfare Act . . . preferred placements were ignored, [it] is immaterial to the question whether termination based on a failure to remedy the condition which made the out-of-home placement necessary is appropriate."); *In re Vincent M.*, No. H034767, 2010 WL 2557188, at *8 (Cal. Ct. App. June 25, 2010) ("[A]ctive efforts and placement [are] two separate, distinguishable issues."); *In re A.A.*, 84 Cal. Rptr. 3d 841, 863 (Cal. Ct. App. 2008) ("[W]e distinguish the issue of placement from that of active efforts." (citing 25 U.S.C. §1914)); *In re J.W.*, 528 N.W.2d 657, 662 (Iowa Ct. App. 1995) (Appellant "provides no authority for her assertion that noncompliance with section 1915 requires reversal of the trial court's termination order.  The remedial provisions of section 1914 do not apply to violations of section 1915."); *B.R.T. v. Exec. Dir. of Soc. Serv. Bd. N. D.*, 391 N.W.2d 594, 601 (N.D. 1986) ("[I]nvalidation of a parental rights termination may not be accomplished by showing a violation of the placement preferences in a proceeding brought pursuant to 25 U.S.C. § 1914."); *State ex rel. Juvenile Dep't of Multnomah Cty.  v. Woodruff*, 816 P.2d 623, 625 (Or. Ct. App. 1991) ("Failure to comply with the foster care placement preferences in § 1915(b) is not a basis for invalidating a court order terminating parental rights." (citing 25 U.S.C. § 1914)).  *But see In re K.B.*, 93 Cal. Rptr. 3d 751, 765 (Cal Ct. App. 2009) (assuming the applicability of placement preferences to active efforts, but finding "no evidence that there was any suitable member of the children's extended family available for placement or any evidence that any other member of the Choctaw Nation was available to take the children[.]"); *In re L.N.W.*, 457 N.W.2d 17, 20 (Iowa Ct. App. 1990) ("We do

(continued . . .)

[¶20.] The Alaska court also noted in *David S.* that its own prior decisions rejected similar active efforts arguments for the reason that "[t]he relevant issue" in termination cases is whether termination is "in the best interests of the children, not what" happens to them after termination. *Id.* at 780 (quoting *Jacob W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-12972, S-13017, 2008 WL 5101809, at *9 (Alaska December 3, 2008)). *Accord Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1120 (Alaska 2010). Thus, the court reasoned that, "placement decisions present a separate analytical question from termination decisions" and that "[t]here is no support in ICWA for an attempt to graft § 1915's placement preferences onto § 1912" and its active efforts requirement. *David S.,* 270 P.3d at 780. This is despite Bureau of Indian Affairs Guidelines that, in making active efforts, state agencies "involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers." *Id.* (quoting Guidelines for State

_____

(. . . continued)

> not necessarily disagree with the appellant's contention that the party seeking termination must also demonstrate that services were also offered to the extended members of the Native American family . . ., but we need not rule on that question for it is clear to us after reviewing the entire record that services were offered to [the appellant's] family as a whole."); *M.S.S.*, 465 N.W.2d at 419 ("[W]e conclude the trial court erred in not having required the county to extend the focus of its efforts to the extended family and the Indian child's tribe."); *but see also Wilson*, 2003 WL 21266612, at *2 (distinguishing *M.S.S.* on the basis that the tribe in *Wilson* argued against the mother's proposed placement in the trial court, the trial court addressed and rejected the placement, and the tribe participated in the appeal and resisted the placement). The Montana Supreme Court has more recently endorsed *David S.*, noting that "[c]ourts have held that placement is a separate issue from active efforts, and that the two issues must be analyzed separately." *In re. K.B.*, 301 P.3d 836, 843 (Mont. 2013) (quoting *Thea G. v. State*, 291 P.3d 957, 963 (Alaska 2013)).

Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,592 (November 26, 1979)).

[¶21.]        Finally, the court noted in *David S.* that even if ICWA placement preferences were relevant, Alaska's OCS followed them by exploring placement options with several of the child's family members.  270 P.3d at 781.  The court went on to explain the ways in which those placement efforts failed and then cited BIA guidelines defining "good cause" for departure from the placement preferences to include the "unavailability of suitable families for placement[.]"  *Id.* at 782 (quoting Guidelines for State Courts, 44 Fed. Reg. at 67,594, F.3(a)(iii)).  The court concluded that, "[b]ecause OCS *did* explore the availability of 'suitable families,' [the] case [fit] within this 'good cause' exception."  *Id.* (emphasis added).

[¶22.]        Federal regulations continue to contain a good cause exception from ICWA placement preferences for "[t]he unavailability of a suitable placement after a determination by the court that a diligent search was conducted to find suitable placements meeting the preference criteria, but none has been located."  25 C.F.R. § 23.132(c)(5) (2016).  DSS's unsuccessful efforts to find a suitable placement for child with father's family due to the family's lack of response are recounted above. DSS workers also testified during the dispositional hearing to their familiarity with ICWA placement preferences, their efforts to find a suitable placement for all the children, and the children's placement with non-Native American foster parents in proximity to mother and father during the reunification phase.  The DSS workers agreed that an ideal placement would have been with Native American relatives, or a Native American family in proximity to mother and the fathers during attempted

reunification, but none were available.[11]  Nevertheless, the workers testified that their placement efforts were ongoing, that they would continue post-disposition, and that they would include father's family members identified during the dispositional hearing.

[¶23.]     The trial court made the following findings as to compliance with the placement preferences:

> 14.    The Court finds that the foster placement decisions made for these children were made not simply for the purpose of maintaining sibling bonding, but also for the purpose of facilitating reunification with the parents, and encouraging visitation and further bonding between parents and children.
>
> 15.    The Court does not find a violation of ICWA, either intentional or otherwise, in DSS's foster placement of these children, and acknowledges the performance of kinship services, which proved to be unsuccessful.  Given the decision of the Court to terminate parental rights in this case, it continues to be the expectation of the Court that the ICWA placement preferences will be followed for these children, absent a finding of good cause to support other placements.

[¶24.]     Based upon the DSS workers' testimony and the trial court's findings, even if the ICWA placement preferences were relevant, DSS followed them by exploring placement options with several of child's family members.  *David S.*, 270

---

11.    Licensed Native American foster parents related to one of the other fathers in the case did volunteer at one point to be a placement option for all the children here.  However, between their own children and foster children, the foster parents already had six children in their home, and there had already been some supervisory problems in the home.  For these reasons, the trial court rejected the foster parents as an immediate placement option in the months before the dispositional hearing here.  A DSS worker testified during the dispositional hearing that the foster parents were no longer interested in being a placement option in this case.

P.3d at 781. Alternatively, because DSS explored the availability of a "suitable . . . placement" for child with a "diligent search," but was unsuccessful, there was good cause for departure from the placement preferences. *Id.* at 782 (citing Guidelines for State Courts, 44 Fed. Reg. at 67,594, F.3(a)(iii)). Under either view, there was no violation of the placement preferences. *Id.*; 25 C.F.R. § 23.132(c)(5) (2016).

**Conclusion**

[¶25.]        Father's argument that DSS failed to make active efforts to prevent the breakup of his family by failing to comply with ICWA placement preferences and failing to place child with any of his reservation family members is without merit because: there were credibility issues related to his proposed placements; some proposed custodians were not identified; and child's tribe did not endorse father's proposed placements. *J.B.*, 698 N.W.2d at 170. Further, compliance with placement preferences is generally not a factor in determining whether active efforts were made. *David S.*, 270 P.3d at 779-80. Finally, even if compliance with placement preferences were a factor, DSS complied with the preferences or had good cause to depart from them. *Id.* at 781-82.

[¶26.]        For these reasons, there was no trial court error in terminating father's parental rights based upon DSS's failure to make active efforts to prevent the breakup of the Indian family. The trial court's order terminating parental rights is affirmed.

[¶27.]        ZINTER,[12] KERN, JENSEN, and SALTER, Justices, concur.

---

12.    Justice Steven L. Zinter cast his vote prior to death.