#29279-a-MES
**2021 S.D. 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE PEOPLE OF THE STATE OF
SOUTH DAKOTA IN THE INTEREST
OF A.A., A.T., AND A.A., MINOR
CHILDREN AND CONCERNING
V.T. AND O.A., RESPONDENTS AND
LOWER BRULE SIOUX TRIBE,
INTERVENORS.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE TONY L. PORTRA
Judge

* * * *

JEREMY LUND of
Siegel, Barnett & Schutz, LLP
Aberdeen, South Dakota

Attorneys for respondent father
and appellant, O.A.


JASON R. RAVNSBORG
Attorney General

COURT W. ROPER
Department of Social Services
Pierre, South Dakota

Attorneys for petitioner and
appellee.

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 16, 2021
OPINION FILED **12/08/21**

#29279

SALTER, Justice

[¶1.]        O.A. (Father) and V.T. (Mother) are the parents of A.A., A.T., and A.A. (the Children) who were the subjects of an abuse and neglect proceeding before the circuit court.  The case began in March 2018 and ended in February 2020 with the court's final dispositional order terminating the parental rights of both parents.  Father appeals; Mother does not.  We affirm.

## Facts and Procedural History

[¶2.]        In early 2018, A.A. and A.T. lived with Mother in an apartment in Aberdeen.  Father also lived in Aberdeen, but with a male roommate.  Father was not an active caregiver for the two children who were, at the time, an eighteen-month-old toddler and a six-month-old infant.  Father is originally from South Sudan, and Mother is an enrolled member of the Lower Brule Sioux Tribe (the Tribe).

[¶3.]        On March 17, 2018, Mother's neighbor contacted law enforcement after hearing a loud pounding noise and children crying in a nearby apartment.  A police report included in the record indicates that officers from the Aberdeen Police Department responded and, after hearing a seemingly inconsolable infant crying inside, determined that Mother's apartment was the likely source of the noise.  The officers knocked and announced their presence, but no one answered the door.  One of the police officers looked inside an apartment window and saw two small children.  The officer also noticed a woman, who appeared to be impaired, holding a rag over her mouth.  Her movements, the officer noticed, were slow and sluggish, and she was unable to support the head of the infant lying in her arms.

[¶4.] Officers identified the woman as Mother, but their continued efforts to get her to answer the door were unsuccessful. Deeming the situation an acute risk to the Children's welfare, officers obtained a master key and entered the apartment. There they encountered a toddler and Mother still holding the infant in her lap. Mother was holding a can of hair spray she had been huffing, and officers later discovered 24 empty cans of hair spray. The Children were taken into protective custody by the Department of Social Services (DSS).[1]

[¶5.] Mother was arrested and taken to jail. Police officers attempted to contact Father but without success. Mother and Father had been romantically involved intermittently since 2010, and Mother reported that Father did not share childcare responsibilities and was in and out of the Children's lives. She also told DSS that she had not spoken to Father in two weeks. DSS could not locate Father before the 48-hour review hearing, and the circuit court granted DSS emergency temporary custody of the Children. The court determined that the Indian Child Welfare Act (ICWA) applies because the Children are eligible for enrollment in the Tribe and are, therefore, considered Indian children. *See* 25 U.S.C. § 1903(4) ("'Indian child' means any unmarried person who is under the age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]"). The Tribe

---

1. The youngest child, whose initials are also A.A., was not born until October 26, 2018. References to "the Children" mean the older children, A.A. and A.T., before the younger A.A.'s birth and means all three children following A.A.'s birth.

received proper notice at the outset of the case and participated to some extent during its pendency.

[¶6.] DSS began an initial family assessment and the process of locating potential kinship placements for the Children. DSS also facilitated weekly visits for Mother with the Children, and after DSS located Father, it facilitated weekly visits for him. DSS provided transportation assistance when needed. On May 1, the circuit court held a hearing, and both Mother and Father appeared personally. At the hearing, Father requested that the court appoint him counsel, and counsel for Mother requested that the court continue the adjudication hearing until Father appeared with counsel. The State requested that the court keep legal and physical custody of the Children with DSS. Mother agreed, and the court ordered DSS's continued legal and physical custody of the Children.

[¶7.] At a review hearing on August 13, 2018, the State relayed that Mother had completed chemical dependency treatment and was in aftercare. It also informed the circuit court that Mother and Father had reconciled and started living together. DSS's report to the court identified that six relatives were being considered for placement of the Children, but none had been approved. The report also noted that DSS finished the initial family assessment on August 7, 2018. DSS reported that Mother and Father's recent visits with the Children supported moving toward a permanent plan of reunification. In its report, DSS recommended that the court return physical custody of the Children to Mother and Father under an in-home safety plan. The court continued legal and physical custody of the Children

with DSS, but it allowed DSS to implement a safety plan for the Children to return home.

[¶8.] The Children were placed in their parents' physical custody for a trial reunification in early October 2018, and the youngest child, A.A., was born during the trial reunification. On October 29, the circuit court held an adjudicatory hearing. At the hearing, Mother admitted that the older two children were abused or neglected due to an environment injurious to their welfare. Father did not appear personally at the hearing. However, counsel for Father informed the court that Father would be entering a no-fault admission at a later hearing. During the hearing, DSS informed the court that Mother had been staying sober and was cooperating with DSS. The court continued legal custody of the Children with DSS but placed the Children in the physical custody of Mother and Father.

[¶9.] On November 10, Mother became intoxicated and purportedly kicked Father out of the family's apartment. Father left the Children with their intoxicated Mother and did not contact DSS, but he advised the person acting as the safety-plan provider of Mother's condition.[2] This person went to Mother's apartment at approximately 11:00 p.m. and found her too intoxicated to function. He stayed with her and the Children until 2:00 a.m. The next day, the safety-plan provider returned to Mother's apartment and did not find her or the Children there;

---

2.    At the dispositional hearing, DSS explained that an in-home safety plan involves parents creating a list of contacts to act as safety-plan providers. The safety-plan providers are willing to go into the parents' home unannounced, meet with the children, and conduct family visits to ensure there are no safety concerns and thereafter report back to DSS.

he then reported the incident to DSS. Father also contacted DSS on November 12 and advised that he did not know the whereabouts of Mother or the Children.

[¶10.] Between November 11 and November 24, law enforcement and DSS were unable to locate Mother or the Children. Father saw Mother at an Aberdeen bar on November 25 and contacted law enforcement. Officers later found Mother at a local Aberdeen residence intoxicated and without the Children. Mother claimed she had not seen the Children in four days and did not know where they were, but she then recalled they were with her brother. Officers located the Children at the home of Mother's brother, and they were placed in DSS's custody. DSS suspended the trial reunification and placed the Children with a foster family in Clark.

[¶11.] At a second adjudicatory hearing in January 2019, Father entered a no-fault admission that the Children were abused or neglected. The circuit court also found that the youngest child was abused or neglected by Mother based on the November 11 incident and the ensuing effort to find Mother and the Children. In a report to court for this hearing, DSS noted that Mother had not been in contact with DSS since November 26, did not attend aftercare since November 6, and did not show up for her updated chemical dependency evaluation on December 10. DSS further reported that while Father "actively participated in his case plan and keeps in regular contact" with DSS, he admitted that he left the Children in Mother's care when she was intoxicated. In the report, DSS explained that Father "has needed assistance from DSS during his supervised visitation and did not appear to be able to care for all three children on his own." The court continued legal and physical custody of the Children with DSS.

[¶12.]    After this hearing, Father continued to associate with Mother and their relationship turned violent. In January 2019, Father was arrested for domestic assault when he kicked in a door at Mother's apartment and pulled her hair. In March, a witness reported that Father choked Mother, threw her against the witness's van, and chased after the van when Mother entered the van to escape. In April, Father was arrested on a domestic assault warrant when police officers responded to a verbal argument involving the couple. In August 2019, Father was arrested again, this time for punching Mother in the face after she threw paint at him. In all, Father was convicted, pursuant to his guilty pleas, of three domestic-related assault charges in 2019.

[¶13.]    Beyond this, Father showed little interest in replacing Mother as the Children's caretaker. According to DSS, from February to April 2019, Father did not stay in contact with DSS and did not participate in the case planning process. Though after April 2019, he resumed contact with DSS, it was sporadic, and he would not return calls regarding visitation with the Children. DSS reported that in May 2019, Father indicated a desire to restart visitation with the Children, and DSS resumed facilitating weekly visits. According to DSS, during these visits, Father's interactions with the Children were appropriate, but he continued to display an inability to care for all three children on his own. At each visit, a DSS worker would assist Father either in providing care or in explaining to him what needed to be done.

[¶14.]    In the summer of 2019, Father relocated from Aberdeen to Brookings, where he and Mother stayed with her relatives for a few days before Father began

living in a tent. He then decided to move to Sioux Falls in October. This meant Father lived farther from the Children than before; however, Father claimed he moved to Sioux Falls to obtain employment and to be closer to his family. Father moved into an apartment in Sioux Falls, but he told DSS that it was not suitable for the Children, for visitation or otherwise. As a result, DSS facilitated visitation with the Children for Father at a local mall.

[¶15.] After hearings in June and August 2019, during which the circuit court continued physical and legal custody of the Children with DSS, the State filed a petition for termination of parental rights in September 2019. In December 2019, after the case had been pending for 21 months, Father, for the first time, suggested he could care for the Children with the help of relatives. Father indicated that his brother, who lived in St. Cloud, Minnesota, was willing to help him with the Children.[3] DSS contacted the brother who was supportive of Father but not prepared to care for the Children himself.

[¶16.] The circuit court conducted the dispositional hearing on two non-consecutive days in February 2020. At the initial February 11 hearing, the State presented testimony from the DSS family specialist assigned to this case. The specialist testified that she had recommended Father attend counseling due to a traumatic childhood, but "he was kind of closed off to that idea." The specialist testified that she had also recommended that Father obtain a domestic violence assessment due to his history of violence.

---

3. Earlier in the case, Father had mentioned the fact that he had relatives in Minnesota and provided the name of a sister. However, he did not provide the name of his brother.

[¶17.]     The evidence indicates that Lutheran Social Services (LSS) conducted the assessment in January 2020, shortly before the dispositional hearing.  The LSS evaluator's report concluded that Father was not being honest regarding his past domestic disputes with Mother and that he blamed her for all the incidents.  The evaluator also noted that there were discrepancies between Father's explanations regarding the abuse and the police reports.  Given the conclusion that Father refused to accept responsibility for his actions, the evaluator recommended that Father complete a 24-week domestic abuse program.  The DSS specialist testified that Father had not started the 24-week course.

[¶18.]     The specialist acknowledged that Father had recently been working on his case plan, but she explained that the plan was the same plan "that [DSS and Father] have talked about since the beginning of the case."  The specialist further highlighted that Father had "waited 22 months into the case" to "decide to work on services" (e.g., parenting classes, domestic abuse program).[4]  The specialist related that Father "has issues with trying to provide care for all three of his children," and during visits with the Children in Sioux Falls at the mall, he would not change the Children's diapers and would often focus on only one child instead of all three.

[¶19.]     The State also presented expert testimony from Luke Yellow Robe who offered his opinion that termination of parental rights for Mother and Father was the least restrictive alternative because continued custody by either parent was

---

4.     Although Father attended anger management classes while living in Aberdeen, he did not complete the course after moving away from Aberdeen, and he was subsequently arrested for another domestic assault.

likely to result in serious emotional or physical damage to the Children.[5] During cross-examination by Father's counsel regarding the specific basis for his opinion, Yellow Robe explained that Father had not made a serious attempt to become the Children's caretaker until shortly before the dispositional hearing. Although Father had recently started parenting classes, he had not started the domestic abuse course recommended by the LSS evaluator. Yellow Robe did not believe that Father would physically abuse the Children. Rather, he was concerned that Father was ill-equipped to care for them, had exposed them to danger by leaving them with Mother, and had let a large amount of time pass without any genuine effort to establish himself as a potential caretaker. In fact, by Father's own admission, his home was not suitable for the Children. Regarding this, Yellow Robe stated simply, "We don't have a home to send the kids [to], that's where I stand."

[¶20.] After the conclusion of the February 11 court session, Father obtained a two-bedroom apartment, and when the circuit court reconvened the dispositional hearing on February 20, Father attempted to neutralize the claim that he lacked a home for the Children and that termination was the least restrictive alternative. He relied upon a federal ICWA regulation to argue that without a causal

---

5. ICWA requires expert testimony in proceedings involving the termination of parental rights concerning Indian children:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f).

connection, inadequate housing, alone, could not support the conclusion that continued custody would be likely to result in serious emotional or physical damage to the Children. *See* 25 C.F.R. § 23.121(c) ("the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage"). He also relied on the testimony of his brother and niece who both expressed their willingness to help. Father's niece lived in Sioux Falls with her fiancé and their newborn twins and offered to provide daycare for the Children while Father worked if DSS returned custody to Father. All three—Father, his brother, and his niece— are originally from South Sudan, and the niece explained that their cultural tradition places childrearing responsibilities with women. In fact, Father testified that men and women live separately from each other.

[¶21.] In addition, Father separately argued that DSS's active efforts to reunify the family had not provided him with meaningful opportunities to become the Children's caretaker. He asserted that the efforts early in the case had focused on re-establishing Mother as the sole caretaker for the Children, and as a result, DSS had not done enough to help him with things like housing and parenting classes.

[¶22.] The State disputed Father's claims, arguing that Father had not wanted to participate in caring for the Children and had not presented himself as an option for sole custody until 20 or 21 months after the abuse and neglect case began. The State cited the fact that Father twice left the Children in peril with Mother when she was significantly impaired and unable to care for them. Though

he was interested in visits with the Children, the State contended he was not otherwise disposed to accept sole caretaking responsibilities. The State emphasized that he continued to associate with Mother after the unsuccessful and alarming end to the trial reunification in October and November 2018. He was convicted of domestic abuse offenses three times in 2019 and moved frequently and farther away from the Children. Only as the dispositional hearing approached, the State argued, did Father start to formulate a plan to care for the Children.

[¶23.]     The circuit court agreed with the State's assessment, by and large, and issued an oral decision terminating the parental rights of Mother and Father.[6] The court described Father's decisions to leave the Children in danger with Mother as a "complete abdication of his role as their father." Faced with such a perceptible and grave risk to the Children, the court stated, Father should have acted to "step up" and protect them without regard to cultural norms that might otherwise apply. The court also characterized Father's recent efforts to avoid termination of his parental rights as "11th hour arguments" being offered "at the last minute." The proposed arrangement with Father's brother and niece was not realistic in the court's view. It was clear to the court that Father's brother did not intend to personally care for the Children, but rather, he intended to place the Children with Father's niece. Finally, the court noted that the case had been pending for 23 months, and the Children deserved a measure of permanency.

---

6.     Mother elected not to be present at either day of the dispositional hearing, though she was represented by counsel who confirmed her desire to not personally participate.

[¶24.]     The State prepared proposed findings of fact and conclusions of law and submitted them to the circuit court electronically on February 25, 2020. The court signed the State's proposed findings and conclusions the same day and did not wait the requisite five days required under the rules of civil procedure. *See* SDCL 15-6-52(a). Father's counsel filed objections to the State's proposed findings and conclusions the following day and also proposed findings and conclusions. The record does not reflect that the court considered Father's objections or proposed submissions.

[¶25.]     Father now appeals, raising the following issues, which we restate as follows:

> 1.     Whether the circuit court erred when it signed the State's proposed findings.
>
> 2.     Whether the circuit court erred when it determined that DSS made active efforts to prevent the breakup of the family.
>
> 3.     Whether the circuit court erred when it found that continued custody of the Children by Father was likely to result in serious emotional or physical damage to the Children.
>
> 4.     Whether the circuit court clearly erred when it found that termination of Father's parental rights was the least restrictive alternative commensurate with the best interests of the Children.

**Analysis and Decision**

*Prematurely Signed Findings of Fact and Conclusions of Law*

[¶26.]     "We review legal questions arising under the rules of civil procedure de novo, utilizing our established rules for statutory construction." *Leighton v. Bennett*, 2019 S.D. 19, ¶ 7, 926 N.W.2d 465, 467–68 (citing *Moore v. Michelin Tire*

*Co., Inc.*, 1999 S.D. 152, ¶ 16, 603 N.W.2d 513, 519–20). A circuit court "shall issue findings of fact, conclusions of law, and a final decree of disposition" on completion of the final dispositional hearing. SDCL 26-7A-90. A circuit court may direct counsel for the prevailing party to prepare, serve, and submit copies of proposed written findings of fact and conclusions of law to the court and the opposing party. SDCL 15-6-52(a). A court cannot sign the proposed findings and conclusions until five days after service in order to allow other parties the opportunity to submit objections and additional proposals. *Id.*

[¶27.]      Here, the circuit court erroneously signed the State's proposed findings the same day that they were served. However, contrary to Father's claim that the error renders the court's findings and conclusions "a nullity[,]" this noncompliance with SDCL 15-6-52(a) does not require us to reflexively reverse the circuit court's final order terminating Father's parental rights. Instead, we must determine whether the error was prejudicial. *In re A.D.*, 416 N.W.2d 264, 266 (S.D. 1987). To be prejudicial, the error must produce some effect on the final result and affect the rights of the party assigning it. *Id.* "The burden is on the appellant to show not only error but prejudicial error." *Id.*

[¶28.]      Father lists three mistakes in the circuit court's findings: (1) one finding of fact incorrectly references adjudicatory, not dispositional, proceedings; (2) one contains the wrong dates for the adjudicatory orders; and (3) one indicates that the Tribe filed a motion to intervene, not that the circuit court granted intervention. The State has not disputed the inaccuracies of the three items relating to the procedural history of the case, but it argues the mistakes would not have impacted

the result. We agree. The inaccurate background information had no bearing on the essential questions before the court at the dispositional hearing.

[¶29.] Father also argues at some length that appellate relief is necessary to reinforce the purposes underlying the requirement for findings of fact and conclusions of law that were, in his view, "frustrated" by the circuit court's decision to prematurely sign the findings and conclusions. *See Toft v. Toft*, 2006 S.D. 91, ¶ 12, 723 N.W.2d 546, 550 (holding that findings and conclusions assist appellate review, assure the preclusive effect of the court's decision, and promote careful consideration by the trial court (citing *Heikkila v. Carver*, 416 N.W.2d 591, 592 (S.D. 1987))). We cannot accept this argument for two reasons.

[¶30.] First, discussing the reasons for the requirement to enter findings of fact and conclusions of law does nothing to assist our assessment of prejudice as a consequence of noncompliance—it merely reinforces the need for the rule.[7] Second, the circuit court *did* enter findings of fact and conclusions of law and, though they were premature, they nevertheless assist with our review and have sufficient clarity

---

7.  Father makes a related argument that the provisions of SDCL 26-7A-108 preclude any assessment of prejudice because the statute states that a court cannot modify or set aside "a decree terminating parental rights." He interprets this to mean that a circuit court could not correct its own errors and further suggests, paradoxically, that such a correction is the only way a circuit court could avoid the prejudicial effect of an erroneous decision. Even if SDCL 26-7A-108 meant what Father asserts, which we do not hold here, the claim confuses a circuit court's authority to modify a decree terminating parental rights with our ability to assess errors in a decree for prejudice. We understand that Father's argument responds to the State's citation to two pre-SDCL 26-7A-108 decisions that determined the absence of prejudice because the circuit court corrected the errors before the appeals. *See In re K.D.E.*, 210 N.W.2d 907 (S.D. 1973); *In re T.C.*, 278 N.W.2d 452 (S.D. 1979). However, these decisions simply illustrate a single basis to support a finding of no prejudice—not the exclusive one.

to preclude relitigation. Additionally, the circuit court's oral decision at the conclusion of the dispositional hearing reflects the circuit court's careful consideration of the evidence.[8]

[¶31.] Although prematurely signing the State's proposed findings and conclusions prevented the circuit court from ruling on Father's objections and proposed findings and conclusions, there is no question that his arguments are, nevertheless, preserved for review. Under the circumstances, Father has not established prejudice caused by the circuit court's error.

### *Active Efforts to Prevent the Breakup of the Family*

[¶32.] Prior to terminating parental rights concerning an Indian child, the party seeking termination must show "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of

---

8. Father also suggests that meaningful review by this Court on appeal is thwarted by the circuit court's finding "purport[ing] to incorporate by reference every single report to the court, 'other records, and the evidence [and] argument produced in these proceedings as further factual basis in support of these Final Dispositional Findings of Fact and Conclusions of Law and Order.'" In his view, this finding fails to show that the circuit court considered and resolved the conflicts in the evidence in deciding the issues in this case, e.g., active efforts, least restrictive alternative, etc. We disagree. The court's reference to the existing record (containing past DSS reports), arguments by counsel, and the current DSS report and attachments (considered without objection), does not mean that the circuit court accepted as true all of the information referenced in the reports, arguments of counsel, or attachments. The court's finding also does not prevent this Court's meaningful review of the court's decision, including its oral ruling, in light of the record evidence. Indeed, Father specifically acknowledged that this Court can look both to the court's oral and written findings to determine whether a meaningful review can be had.

the Indian family and these efforts have proved unsuccessful."[9]  25 U.S.C. § 1912(d).

Active efforts must be proven beyond a reasonable doubt.  *In re M.D.*, 2018 S.D. 78,

¶ 13, 920 N.W.2d 496, 499 (citation omitted).  Whether active efforts were provided

is a mixed question of law and fact reviewed de novo.  *In re P.S.E.*, 2012 S.D. 49, ¶

15, 816 N.W.2d 110, 115.

[¶33.]  Active efforts are "affirmative, active, thorough, and timely efforts

intended primarily to maintain or reunite" the Indian family.  25 C.F.R. § 23.2.

These efforts must involve assisting the parents "through the steps of a case plan

and with accessing or developing the resources necessary to satisfy the case plan."

*Id.*  Active efforts should be "tailored to the facts and circumstances of the case[.]"

*Id.*

[¶34.]  Father's argument that DSS violated ICWA by not providing active

efforts to him specifically is unsustainable.  Father focuses solely on the efforts DSS

provided to him, but we have held that a circuit court should consider DSS's efforts

to reunite the family *in its entirety*—not just the efforts provided to one parent in

---

9.     Mother is the only Indian parent, and she has not appealed the termination
       of her parental rights to the Children.  Under the circumstances, it would
       seem, in a sense, as though the breakup of the nuclear Indian family is,
       unfortunately, unavoidable.  However, the parties have not suggested this
       fact impacts the applicability of ICWA here, and, in any event, we note that
       the text of ICWA and its corresponding regulations do not make a distinction
       between an Indian parent and non-Indian parent.  *See* 25 U.S.C. § 1903(9)
       (defining "parent" under ICWA as "any biological parent or parents of an
       Indian child"); 25 C.F.R. § 23.103(a)(1)(i) (stating that ICWA applies
       "whenever an Indian child is the subject of . . . [a]n involuntary proceeding").

particular.[10] *See In re S.H.E.*, 2012 S.D. 88, ¶¶ 23–25, 824 N.W.2d 420, 426–27. The evidence here establishes DSS provided active efforts to both Mother and Father to reunite the family from the beginning of the case.

[¶35.] The record reflects that DSS engaged Father at the beginning of the case, as soon as they were able to locate him, and worked with both Father and Mother on a plan for reunification up until the trial reunification failed. The evidence adduced at trial, including Father's own evidence, established that Father expected Mother to be the Children's sole caretaker, consistent with his Sudanese culture and the couple's history. Consequently, DSS's initial efforts to reunify this family understandably focused more on Mother's chemical dependency issues. In particular, DSS provided Mother a chemical dependency evaluation and follow-up services, including counseling and out-patient treatment. However, DSS's active efforts were not exclusively focused on Mother. DSS referred both parents for parenting classes. It also provided Mother and Father transportation for visitations with the Children, or DSS would arrange for visitation at a convenient location for Mother and Father.

[¶36.] For its part, DSS was certainly willing to consider Father in a caretaking role as evidenced by its decision to return the Children for a trial reunification to the shared residence Mother and Father were trying to establish in

---

10. DSS's efforts to reunite the family in this case included: an initial family assessment, protective capacity assessments and evaluations, foster care services, medical services, visitation, transporting to visitation, gas cards, clothing vouchers, grocery vouchers, Special Supplemental Nutrition Program for Women, Infant, and Children (WIC) services, substance abuse treatment and aftercare, daycare, kinship locator referrals, child case plans and evaluations, and supervised visits in the home.

October 2018. The DSS specialist testified that she repeatedly emphasized to Father the need to assist Mother who was often overwhelmed with the childcare responsibilities, which, at that time, included a newborn infant. Although DSS had referred both parents for parenting classes, neither one attended, and according to DSS, Father indicated that he did not have time and did not need to attend parenting classes. A trial reunification was attempted regardless, but it only lasted one month and came to a dramatic and harrowing conclusion after Father left the Children in Mother's care while she was impaired, leading to uncertainty about the Children's whereabouts for nearly two weeks. The fact that these active efforts were not successful does not diminish the fact that they were undertaken. *In re D.M.*, 2003 S.D. 49, ¶ 23, 661 N.W.2d 768, 774.

[¶37.] Even after the trial reunification and Mother's cessation of all cooperation, DSS continued to facilitate visits between Father and the Children. But unfortunately, the visits were often at irregular intervals during much of 2019 due to Father's arrests, confinement in jail, frequent moves farther away from the Children's foster home in the Clark area, and Father's failure to maintain consistent contact with DSS. Father did not have his own transportation, so DSS would either take him to the visits or arrange to have the foster parent bring the Children to a location for the visit near Father. Further, DSS provided Father with transportation to the Housing Development Authority in an effort to find suitable housing while he was living in Aberdeen.

[¶38.] When Father moved to Sioux Falls, he did not initially inform DSS of his relocation. Once DSS discovered that Father had moved and visitation resumed

in November 2019, DSS transported the Children from Clark to Sioux Falls every other week for visitation. DSS also advised Father about the type of apartment that would constitute suitable housing and offered "to help him with any type of paperwork" that might be needed. According to DSS, Father did not indicate to DSS that he needed any assistance in finding housing. Rather, he indicated that he was in contact with persons with apartments available. Despite Father knowing from the outset of this case that he needed to find suitable housing for the Children, it was not until after the first day of the final dispositional hearing that he took the necessary steps to obtain such housing.[11] In fact, he did not attempt to make real progress on the case plan and become the Children's caretaker until 22 months into the case when the dispositional hearing was imminent and the potential for termination of his parental rights loomed large.

[¶39.]     As this Court explained in *In re C.H.*, "DSS cannot simply give a parent a case plan and wait for the parent to complete the plan." 2021 S.D. 41, ¶ 28, 962 N.W.2d 632, 640. Here, however, the evidence supports the circuit court's

---

11    Father testified to multiple reasons why he was unable to obtain an apartment until February 2020. First, he claimed that he did not rent an apartment earlier because he did not have identification. He explained that to obtain an identification card, he needed to renew his green card, but he did not have the money to do so. He then testified that his green card had expired in 2018 and after he had applied and renewed it in November or December of 2019, he was able to get an identification card. He further claimed that at that time, he did not have enough money for a deposit and did not have any credit. However, he was able to apply for and obtain an apartment the day after the first dispositional hearing in February 2020. When asked why he waited until after that hearing, he replied, "I don't know. I didn't see that like it was an opportunity before, but I did see it at the last" hearing.

determination that DSS made active efforts designed to prevent the breakup of the Indian Family.

***Custody of Children and Serious Emotional or Physical Harm to Children***

[¶40.] Termination of parental rights requires a showing "'by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.'" *In re A.B.*, 2016 S.D. 44, ¶ 16, 880 N.W.2d 95, 101 (quoting 25 U.S.C. § 1912(f)). A finding that continued custody is likely to result in serious emotional or physical damage is reviewed for clear error. *Id.* ¶ 24, 880 N.W.2d at 103. Under this standard of review, we will not set aside the circuit court's findings unless it is "left with a definite and firm conviction that a mistake has been made." *In re M.V.*, 2011 S.D. 81, ¶ 15, 808 N.W.2d 916, 919 (citation omitted).

[¶41.] This Court has previously held that ICWA regulations promulgated through formal rule-making are binding on state courts. *In re E.T.*, 2019 S.D. 23, ¶ 15, 932 N.W.2d 770, 774; *see generally Pickerel Lake Outlet Ass'n v. Day Cnty.*, 2020 S.D. 72, ¶ 27, 953 N.W.2d 82, 92–93 (regulations must be adequately sourced to the statutory authority they purport to interpret). Thus, in order to terminate Father's parental rights, "the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the [Children by Father] will result in serious emotional or physical damage[.]" *See* 25 C.F.R. § 23.121(c). Without a causal connection between the conditions and likelihood of damage, evidence showing "only the existence of community or family

poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior" is not *by itself* sufficient to terminate Father's parental rights. 25 C.F.R. § 23.121(d).

[¶42.] Father was arrested three times in 2019 alone for domestic abuse. The record indicates that he refused to take responsibility for these actions and constantly blamed Mother for both his domestic abuse convictions and the trial reunification's failure. Yet, as the circuit court recognized, Father's own conduct contributed to the unsuccessful trial reunification because he endangered the Children by leaving them with Mother while she was heavily intoxicated. Additionally, throughout the Children's lives, Father was never decisively involved in their care, and even the plan he ultimately proposed appears to contemplate his niece would become the primary caretaker for the Children.

[¶43.] The ICWA expert, Luke Yellow Robe, testified that in addition to the problematic aspects of Father's conduct and decisions during the pendency of the case, Father's lack of housing for the Children supported his expert opinion that the Children would suffer serious physical or emotional harm if Father obtained custody. To support his view, Yellow Robe related his concerns with taking the Children "out of a good, safe home" and placing them with Father "when he hasn't been through the parenting classes, when he hasn't completed the domestic violence classes."

[¶44.] We acknowledge that Father's inadequate housing, alone, cannot establish beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the Children. *See* C.F.R. § 23.121(d).

However, the circuit court did not rely solely on Father's inadequate housing when it found it was likely that Father's continued custody of the Children would result in serious physical or emotional harm. It also credited evidence that Father abdicated his role as the Children's father by failing to ensure their safety, particularly in circumstances of acute risk and peril, and by living an unstable, itinerant lifestyle. In the court's view, Father's belated plan for his niece to care for the Children was further evidence of Father's detachment from the role of the primary caretaker.

[¶45.] In addition, the court found that Father had not taken responsibility for his conduct, which hindered efforts to reunite the family. In particular, the court noted that according to Father's domestic violence assessment, Father was casting the blame for his abusive acts on Mother, highlighting the need for domestic violence classes.[12] We therefore conclude that the circuit court did not clearly err in finding that Father's continued custody of the Children would result in serious physical or emotional harm.

---

12. Although the circuit court did not explicitly find the existence of a causal connection between the conditions in Father's home and harm to the Children, the court's other written and oral findings unmistakably reflect that the court was equally concerned with Father's history of domestic violence and his abdication of his parenting responsibilities when it determined that Father's continued custody was likely to result in serious emotional or physical harm to the Children. *See In re S.B.*, 459 P.3d 214, 224 (Mont. 2019) (noting that a causal connection was implicit in the court's finding that continued custody was likely to result in serious emotional and physical harm to children given the evidence in the record of how father's substance abuse interfered with his parenting and prevented him from protecting the children and keeping them safe).

***Least Restrictive Alternative in the Best Interest of Children***

[¶46.]        In order to terminate parental rights, a circuit court must find that termination is the least restrictive alternative commensurate with the best interest of the child by clear and convincing evidence.  *A.B.*, 2016 S.D. 44, ¶ 16, 880 N.W.2d at 101.  The circuit court's finding that termination is the least restrictive alternative is reviewed under the clearly erroneous standard of review.  *Id.*

[¶47.]        "Children have a right to have a stable family environment.  Additionally, the least restrictive alternative is viewed from the child's point of view.  Children have a right to be a part of a family and should not be required to wait for parents to acquire parenting skills that may never develop."  *In re J.G.R.*, 2004 S.D. 131, ¶ 22, 691 N.W.2d 586, 593 (internal citations omitted) (internal quotation marks omitted) (citing *In re S.A.H.*, 537 N.W.2d 1, 6 (S.D. 1995)).  The Children's "need for permanence and stability . . . cannot be postponed.  It must be provided early."  *In re A.S.*, 2000 S.D. 94, ¶ 24, 614 N.W.2d 383, 387 (citation omitted).

[¶48.]        The circuit court's findings regarding termination of Father's parental rights centered around the Children's acute need for stability in light of the lengthy pendency of the case and the lack of Father's success to establish himself as the Children's caretaker.  The court noted that the case had been pending for nearly two years, far beyond the length of time abuse and neglect cases are normally pending without a disposition.  Further, the court stated it would not consider another trial reunification until Father finished domestic violence classes, which would lead to a minimum delay of over 20 weeks.  We agree with the court's

determination that given his history, Father would need to successfully complete domestic violence classes before regaining physical custody of the Children. All children should be in a home that is free of abuse.

[¶49.]     Nevertheless, Father argues that termination was not the least restrictive alternative because, at the time of the continued dispositional hearing, he had a stable job, stable housing, and ended his relationship with Mother. But this argument fails to consider the evidence of this case in its entirety, including Father's lack of effort in becoming the Children's caretaker until 22 months into the case. More importantly, despite the case spanning 22 months, Father continued to show during his visits with the Children that he did not have the requisite parenting skills to serve as the Children's sole caretaker. Also, although Father obtained different housing during the nine-day continuance between the first and second day of the final dispositional hearing, this last-minute effort to forestall termination does not account for the need to further the Children's best interests by promoting permanency.

[¶50.]     Father alternatively argues that a less restrictive alternative would be for the court to place the Children in a guardianship with his niece. The circuit court found that it could not simply place the three young Children with Father's niece, who was already caring for two-month-old twins, without further information about the propriety of that placement. Beyond this, the court noted that had Father identified someone other than his sister to DSS when asked about potential relative placements at the beginning of the case, there might have been information for the court to consider, such as a home study or some equivalent thereof, as it relates to a

relative placement. Finally, the court stated that the belated nature of Father's proposal that he personally obtain custody would necessarily require, at the very least, a delay for a trial reunification period, leading to protracted uncertainty for the Children. The circuit court's determination that terminating Father's parental rights represented the least restrictive alternative to address the Children's best interests is supported by the record and not clearly erroneous.

**Conclusion**

[¶51.] Although the circuit court erred when it signed its findings and conclusions prior to the expiration of the required five-day period, the error did not prejudice Father. He was able to raise the issues presented in his objections and alternative proposals in this appeal. The circuit court did not err in determining beyond a reasonable doubt that DSS provided active efforts to prevent the breakup of the Indian family and in finding that Father's custody of the Children would result in serious emotional or physical harm. Finally, the circuit court did not clearly err when it found that the termination of Father's parental rights was the least restrictive alternative.

[¶52.] Affirmed.

[¶53.] JENSEN, Chief Justice, and KERN and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶54.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.